·**Ellen HOWLEY, Plaintiff–Appellant,**

v.

**TOWN OF STRATFORD and William Holdsworth, Defendants–Appellees.**

**Docket No. 99–7966.**

United States Court of Appeals, Second Circuit.

Argued Feb. 17, 2000.

Decided June 23, 2000.

*Broadcasters, Inc. v. FCC*, 385 F.2d 967, 968 (D.C.Cir.1967) (holding that a regulatory action that did not impose an obligation, deny a right, or fix a legal relationship was not reviewable); *see also, e.g., Telecommunications Research & Action Ctr.*, 750 F.2d at 78–79 ("[W]here a statute commits review of agency action to the Court of Appeals, any suit seeking relief that might affect the Circuit Court's future jurisdiction is subject to the *exclusive* review of the Court of Appeals." (emphasis added)); *Illinois Citizens Comm. for Broadcasting v. FCC*, 515 F.2d 397, 402 (D.C.Cir. 1974) ("[T]o be final an order must impose an obligation, deny a right or fix some legal relationship ...." (citation and internal quotation marks omitted)).

In this case, we have no doubt that the Public Notice of the Auction of C and F Block Broadband PCS Licenses is an appealable decision or order of the FCC. *See, e.g., Mountain Solutions, Ltd. v. FCC*, 197 F.3d 512, 520 n. 12 (D.C.Cir.1999) (treating denial of a waiver as an "adjudicatory decision"); *Fidelity Television, Inc. v. FCC*, 502 F.2d 443, 452 (D.C.Cir.1974); *cf. Mesa Airlines v. United States*, 951 F.2d 1186, 1188 (10th Cir.1991); *California Assoc. of the Physically Handicapped, Inc. v. FCC*, 833 F.2d 1333, 1334 (9th Cir.1987).

The FCC's Notice announced that specified licenses—those formerly possessed by NextWave—were to be re-auctioned. It is easy to conclude that this "den[ies] a right." *Illinois Citizens Comm.*, 515 F.2d at 402. And if that decision is appealable, its regulatory nature requires that it be appealed in the court of appeals.

Karen Lee Torre, New Haven, CT, for Plaintiff–Appellant.

Richard J. Buturla, Milford, CT; Berchem, Moses & Devlin, Milford, CT, on the brief, for Defendant–Appellee, Town of Stratford.

Before: KEARSE, JACOBS, and POOLER, Circuit Judges.

KEARSE, Circuit Judge.

Plaintiff Ellen Howley appeals from so much of a final judgment of the United States District Court for the District of Connecticut, Alfred V. Covello, *Chief Judge,* as (1) dismissed her complaint alleging that defendant Town of Stratford ("Town") failed to promote her to the position of assistant chief of its Fire Department ("Department" or "Fire Department"), and permitted a hostile work environment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* as amended by the Civil Rights Act of 1991, and (2) declined to exercise supplemental jurisdiction over her state-law claims against the Town and defendant William Holdsworth for intentional infliction of emotional distress through sexual harassment. The district court granted summary judgment in favor of the Town, dismissing the Title VII claims on the ground that there was insufficient evidence to show (a) that the Town's stated reasons for not promoting Howley were pretextual, and (b) that Holdsworth's verbal abuse of Howley

created a hostile work environment. On appeal, Howley contends principally that the court impermissibly resolved issues of fact that should have precluded the entry of summary judgment on her failure-to-promote claim, and disregarded pertinent evidence in support of her hostile-work-environment claim. For the reasons that follow, we agree, and we vacate the judgment of the district court and remand for further proceedings.

## I. BACKGROUND

The Town's Fire Department consists of approximately 100 firefighting personnel. Howley, who attained the rank of lieutenant, was at all pertinent times the Department's only female firefighter. In the present action, Howley contends principally that the Town, in violation of Title VII, discriminated against her on the basis of gender in denying her a promotion to the position of assistant chief in the Department's fire suppression division, and that it tolerated a hostile work environment in which she was subjected to sexual harassment. Viewed in the light most favorable to Howley as the party challenging the grant of summary judgment, the affidavits, depositions, and documents in the record reveal the following events.

### A. *The Failure To Promote*

Howley joined the Department as a firefighter in 1982 and achieved the rank of lieutenant in July 1989. In June 1992, the Town closed one of its four firehouses, and as a cost-saving measure it, *inter alia,* demoted four lieutenants, including Howley, to the rank of firefighter. The firefighters union to which Howley belonged commenced an arbitration proceeding that eventually resulted in, *inter alia,* Howley's reinstatement as a lieutenant. The arbitration award, issued in May 1994, did not state that the reinstatement or restoration of rank was to be retroactive.

In the meantime, in January 1994, the Town posted an opening for the position of assistant chief in the Department's fire suppression division. One of the qualifications for that position was four years of "line officer" experience. Although the record contains no express definition of that term, there is no dispute that the position of lieutenant is such a "line office[ ]." Howley wished to compete for the position but had been a lieutenant for only some three years prior to the 1992 station closing. Aware of the four-year-line-officer requirement, Howley spoke to Fire Department Chief Roger Macey about the matter. Macey told Howley to file her application despite the unresolved state of the arbitration proceeding seeking reinstatement of her lieutenancy.

Howley filed her application on January 21, 1994, but heard nothing from the Town for several weeks. When she eventually heard a rumor that a date for the assistant-chief examination had been set, she inquired of Macey as to whether she would be allowed to take it, sending a formal letter of inquiry on February 22. By letter dated March 3, 1994, Jacques Obernesser, the Town's director of human resources, informed Howley that she was ineligible because she lacked the requisite four years of line-officer experience due to her demotion to the rank of firefighter upon the 1992 firehouse closing. With union backing, however, Howley challenged that decision; and on March 9 an agreement was reached in which the Town agreed to allow Howley to take the examination on a conditional basis pending resolution of the then-still-pending arbitration proceeding. The examination was held on March 10.

The assistant-chief examination was conducted by an independent company, which used a panel of assessors made up of chiefs, deputy chiefs, and assistant chiefs of fire departments in other Connecticut municipalities ("assessment panel" or "panel"). The panel evaluated the candidates in six areas, including their abilities to supervise the handling of a fire incident, to give safety training, to work with other supervisors, to resolve personnel disputes,

and to handle press interviews. In each area and overall, the candidates were ranked on the basis of the following performance scale:

| | |
|---|---|
| 00 and above | Excellent, Better than Expected. |
| 80 to 89 | Good, Competent, Expected. |
| 70 to 79 | Barely Adequate, Less than Expected. |
| 60 to 69 | Somewhat Inadequate, Less than Acceptable, Failing Score. |
| 50 to 59 | Totally Unacceptable, Failing Score. |

Six candidates, including John J. Cybart, who was eventually given the job, took the examination. Howley was the only female candidate.

By letter dated June 6, 1994 ("Panel Report"), the Town received the examination results and the assessment panel's recommendations. Cybart (to whom the panel referred as candidate # 1) ranked third among the six candidates. Howley (to whom the panel referred as candidate # 4) ranked fifth. The panel recommended Howley "only with the serious reservations" stated in its report on her (Assessment Panel Summary of Candidate # 4 [Howley] at 5), and recommended Cybart only "with the reservations" stated in its report on him (Assessment Panel Summary of Candidate # 1 [Cybart] at 5). As to Howley, the panel's overall summary was as follows:

> The candidate's total score of 77.40 is barely adequate. The assessors noted a number of areas in the exercises where the candidate's performance could be improved. The candidate exhibited a general nervousness and seemed uncomfortable in most of the exercises. The candidate seemed to lack self-confidence and assertiveness, when required. The candidate also did not exhibit the technical knowledge required in the exercises. The assessors felt that this candidate would benefit greatly with more training and experience.

(Assessment Panel Summary of Candidate # 4 [Howley] at 5.) The overall summary as to Cybart was as follows:

> The candidate's total score of 81.66 is in the good category, but it is on the low end. The candidate had some difficulty

in the training exercise (B) and in the meeting with the firefighters (C). In both of these exercises, as well as in the group exercise (D), the candidate was not assertive enough to perform extremely well. The candidate does appear to be able to function in a fire department. However, it was noted in both exercises A and B that the candidate's performance would benefit by more technical knowledge regarding the operations of a fire department.

(Assessment Panel Summary of Candidate # 1 [Cybart] at 5.)

Rather than Cybart (candidate # 1), the assessment panel stated that it "felt that candidate # 2 was clearly the best qualified and [it] recommended [candidate # 2] with no reservations" (Panel Report at 1). The Town hired Cybart.

After receiving a right-to-sue letter, Howley commenced the present suit in 1997. Following a period of discovery, the Town moved for summary judgment, seeking dismissal of the failure-to-promote claim on the ground that the Town had articulated legitimate nondiscriminatory reasons for denying Howley the promotion and that there was no genuine issue as to pretext. The Town argued that Howley had not been promoted "because she did not meet the minimum line officer experience requirement for that position," and that "even if she had had the four years of line officer experience, she would still have been eliminated from further consideration based upon her low test result and the recommendations of the panel of assessors." (Affidavit of Jacques Obernesser dated February 25, 1999, ¶ 16; *see also* Affidavit of Town Manager Mark Barnhart dated March 1, 1999, ¶ 19 (same), and ¶ 18 ("Cybart was selected because we considered him overall to be the best qualified candidate.").)

Howley opposed summary judgment, arguing that the reasons advanced by the Town were not genuine and that the Town's line-officer criterion had not been

applied uniformly to men. She submitted her affidavit stating, *inter alia*, that at least one male firefighter, Robert Wilcoxson, had been considered for a prior assistant-chief position despite lacking four years of line-officer experience; he received the appointment. Howley also pointed out that Cybart himself lacked the supposedly mandatory four years of line-officer experience. Having set forth her past credits, certificates, and commendations for her performance in the Department since 1982, Howley argued that the Town's relaxation of the four-year-line-officer requirement for Wilcoxson and Cybart showed that "the Town is willing to make an accommodation for male employees but is not willing to accord the same courtesy to female employees." (Affidavit of Ellen Howley dated April 20, 1999 ("Howley Aff."), ¶ 11.)

Howley also pointed out that, while the Town claimed that it had hired Cybart because he had the best qualifications for the position, the Town had not received Cybart's résumé until after he was hired and had never sought to verify his representations as to his qualifications. Cybart had never been employed by the Town or its Fire Department; when he became a candidate for the assistant-chief position, he was employed by the corporate fire brigade of the Sikorsky Aircraft Division of United Technologies ("Sikorsky"). Howley stated that a corporate fire brigade is not comparable to a municipal fire department—a view perhaps supported by the assessment panel's evaluation that Cybart "would benefit by more technical knowledge regarding the operations of a fire department" (Assessment Panel Summary of Candidate #1 [Cybart] at 5). Moreover, Howley stated that, in preparing her opposition to the Town's summary judgment motion, she had inquired of Sikorsky and learned that Cybart had misrepresented his Sikorsky position in his 1994 application to the Town. In his application, Cybart stated that he had become Sikorsky's fire chief in July 1990. However, Howley produced a 1992 Sikorsky organization chart that showed Cybart as one of four equally ranked lieutenants; the position of fire chief, which Cybart claimed to occupy, was not on the chart. A 1994 Sikorsky chart showed Cybart as a deputy chief, but with only two persons reporting to him.

The Town did not dispute Howley's assertions that the two appointees identified by Howley, Wilcoxson and Cybart, lacked four years of line-officer experience. Rather, it stated that those men had been given credit for other work experience (Wilcoxson as an assistant chief in the Department's fire prevention bureau, and Cybart as lieutenant and fire chief of the Sikorsky brigade) in satisfaction of the line-officer requirement. Nor did the Town challenge the authenticity of the Sikorsky organization charts produced by Howley, which showed Cybart as merely a lieutenant some two years after he claimed to have been promoted to chief, and never showed him as the chief. Rather, the Town produced an affidavit from Cybart stating that the organization charts, "drawn up" "[s]ubsequent to [his] promotion," were wrong. (Affidavit of John J. Cybart dated May 9, 1999, ¶ 3.)

In a *Ruling on the Defendant, Town of Stratford's, Motion for Summary Judgment* dated August 4, 1999 ("Ruling"), the district court granted summary judgment dismissing Howley's failure-to-promote claim. It stated that

> the court finds no credible evidence of pretext. It is undisputed that Howley did not have the four years of line officer experience necessary for the position of assistant chief, and that she scored second to last on the placement exam. Howley relies in large measure on the fact that the assessment panel that ranked her fifth of six candidates was comprised entirely of men. While this is sufficient to support a prima facie case of discrimination, it is not enough to defeat the town's motion for summary judgment. At the summary judgment

phase of the proceedings the plaintiff can no longer rely simply on allegations but must submit evidence to support such allegations. Howley's contention that the four year requirement is arbitrary as applied and that the assessment panel exhibited gender bias are "mere speculation and conjecture" and find no support in the materials before the court. The Town of Stratford is entitled to decide the qualifications it requires of its personnel and to implement its policies uniformly. On this record, no rational trier of fact could find the town's reasons to be pretextual.

Ruling at 8.

## B. *The Hostile–Work–Environment Claim*

Howley's claim that the Town tolerated a hostile work environment in which she was subjected to sexual harassment, along with her related claims against the Town and Holdsworth for infliction of emotional distress, were based principally on the conduct of Holdsworth at a firefighters benevolent association meeting in April 1995. The issue at the meeting was whether to admit to membership in the benevolent association Cybart, who had been appointed assistant chief in September 1994, and Ronald Nattrass, who had become deputy chief in October 1994. The issue was controversial because Nattrass and Cybart had not come up through the ranks of the Department and were viewed by some as outsiders. Holdsworth supported their admission; Howley was opposed.

The events at the meeting, which do not appear to be materially in dispute, were summarized by the district court as follows:

> Holdsworth was off-duty at the time of the meeting, and Howley was asked to attend even though she was on duty because the membership needed a quorum.
>
> As she entered the meeting, Howley said that the members should "Just vote no" regarding one of the applicant[ ]s

with whom Holdsworth was friendly. Holdsworth responded by angrily telling Howley to "shut the fuck up, you fucking whining cunt." He thereafter made further inappropriate remarks concerning Howley's menstrual cycle.

> Neither of the gentlemen considered during the meeting [was] offered membership. After the meeting, in response to the admonitions of several other firefighters that he should apologize to Howley for his outburst, Holdsworth yelled in Howley's direction that "[t]here is no fucking way that I will fucking apologize to the fucking cunt down there."
>
> When Howley confronted him about his behavior, Holdsworth launched into an extended barrage of obscene verbal abuse, including at least one comment to the effect that the reason she did not make assistant chief was because she did not "suck cock good enough and only made lieutenant."

Ruling at 4.

Howley reported the incident immediately and filed a written complaint the next day. The Department's investigation of the complaint was conducted by Nattrass. During the month following Howley's complaint, the Town asked Howley to agree that it was appropriate for Holdsworth to receive only a reprimand rather than a suspension. After Howley disagreed, the Town suspended Holdsworth for two days, stating, *in toto*, as follows:

> You are hereby suspended from 0700 hours May 20, 1995 through 1700 hours May 21, 1995 for conduct unbecoming an officer on the evening of April 12, 1995. It is further recommended that you apologize to Lt. Howley and "B" shift as soon as possible.

(Memorandum of Deputy Chief Nattrass to Holdsworth dated May 17, 1995.) Holdsworth served the suspension on the weekend of May 20–21. He did not apologize.

The Town moved to dismiss Howley's hostile-work-environment claim on the grounds that Holdsworth's verbal harassment was not sufficiently severe or pervasive to alter Howley's working environment and that the Town had taken suitable steps in response to Howley's complaint. In opposition, Howley contended that the Town's response was inappropriate, beginning with the fact that the investigation had been assigned to Nattrass, whose unsuccessful candidacy for membership in the benevolent association (opposed by Howley) had sparked the April 12 confrontation. She argued further that the action taken by the Town was torpid and tepid. The Town took no action against Holdsworth until some five weeks after his obscene harangue—a tirade Holdsworth did not deny. And then it merely suspended him for two days and informed him that his conduct was "unbecoming." The Town never required Holdsworth to apologize. Further, some five months later, the Department relocated Holdsworth's work assignment to Department headquarters, where Howley worked. Although Howley and Holdsworth did not work the same shift, contact between the two was unavoidable because their shifts were contiguous and because of overtime scheduling.

In addition, Howley's affidavit stated that Holdsworth's harassment had continued after April 1995, albeit taking forms other than obscene verbal assault. Although Holdsworth too was a lieutenant, Howley was his superior by reason of seniority. Holdsworth's continued harassment took the form of insubordination, false statements undermining Howley's authority with other subordinates, and creating safety hazards for Howley. Howley stated that "Holdsworth refuses to acknowledge that I am a Lieutenant," and that although at a fire scene Howley would be entitled to give Holdsworth orders, "Holdsworth would not accept orders from me, thereby presenting a safety risk to myself and the rest of the Company." (Howley Aff. ¶ 34(b).) Further, she stated that on more than one occasion equipment for which Holdsworth was responsible, and which was to be used by Howley on the next shift, had been left in disrepair, both impairing Howley's performance and endangering her safety. In addition, Howley had received complaints from older firefighters resulting from Holdsworth's spreading untrue rumors that Howley sought to give them certain assignments that were likely to cause heart attacks. The Town rejected Howley's request that Holdsworth not be assigned to work at Department headquarters. Howley also presented medical evidence of psychiatric trauma caused by the April 12 incident.

The district court granted the Town's motion to dismiss Howley's hostile-work-environment claim, holding that the single incident of Holdsworth's verbal abuse was insufficient to create a hostile work environment:

It is undisputed that Holdsworth was verbally abusive to Howley on the night of April 12, 1995, and that such conduct is out of place in a civilized society. However, one instance of verbal harassment, standing alone, is insufficient to create a hostile work environment. While a single incident of physical sexual assault may warrant a finding of a hostile work environment ... the same cannot be said for abusive language. The court does not condone, and indeed views with palpable distaste the barrage of insults to which Howley was subjected but cannot find that, as a matter of law, Holdsworth's lack of tact created a hostile work environment. There is no evidence that Howley was ever harassed prior to the evening of April 12, 1995, nor that she has ever been harassed in the years since. Because the court finds that there was no hostile environment, it need not address the adequacy of the town's response and sanction of Holdsworth.

Ruling at 10.

The court also dismissed Howley's remaining federal claim, which is not pur-

sued on this appeal, and it declined to exercise supplemental jurisdiction over Howley's state-law claims. This appeal followed.

## II. DISCUSSION

On appeal, Howley contends that the district court improperly invaded the province of the factfinder by accepting the Town's explanations for its refusal to promote her, and that it disregarded pertinent evidence in dismissing her claim of hostile work environment. For the reasons that follow, we agree that summary judgment was not properly granted.

### A. *The Failure–To–Promote Claim*

In order to make out a prima facie case of discriminatory failure to promote, in violation of Title VII, a plaintiff must show that (1) she is a member of a protected class, (2) she was qualified for the job for which she applied, (3) she was denied the job, and (4) the denial occurred under circumstances giving rise to an inference of discrimination on a basis forbidden by Title VII. *See, e.g., McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The burden that such a plaintiff must meet in order to defeat summary judgment at the prima facie stage is "not onerous," *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and has been described as "de minimis," *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994); *see, e.g., Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988).

If the plaintiff meets that burden, and the employer then comes forward with admissible evidence of a legitimate nondiscriminatory reason for its adverse employment decision, the plaintiff is given an opportunity to adduce admissible evidence that would be sufficient to permit a rational finder of fact to infer that the employer's proffered reason is pretext for an impermissible motivation, *see, e.g., Texas Department of Community Affairs v. Burdine,* 450 U.S. at 254–56, 101 S.Ct. 1089; *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817. However, merely showing that the employer's proffered explanation is not a genuine explanation does not in itself entitle the plaintiff to prevail; the plaintiff is not entitled to judgment unless she shows that the challenged employment decision was more likely than not motivated, in whole or in part, by unlawful discrimination. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 523–24, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Stern v. Trustees of Columbia University,* 131 F.3d 305, 312 (2d Cir.1997); *Fisher v. Vassar College,* 114 F.3d 1332, 1339 (2d Cir. 1997) (en banc), *cert. denied,* 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Department of Community Affairs v. Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

"While we do not second-guess an employer's hiring standards, the reasons for its employment decision, including its alleged reliance on [nondiscriminatory] standards, are subject to scrutiny under Title VII . . . ." *Stern v. Trustees of Columbia University,* 131 F.3d at 313. Circumstances from which invidious discrimination may be inferred include preferential treatment given to employees outside the protected class. *See, e.g., Chertkova v. Connecticut General Life Insurance Co.,* 92 F.3d 81, 91 (2d Cir.1996); *Cronin v. Aetna Life Insurance Co.,* 46 F.3d 196, 204 (2d Cir.1995); *Washington v. Garrett,* 10 F.3d 1421, 1434 (9th Cir.1993).

In deciding a motion for summary judgment, the district court is not to resolve issues of fact but only to determine whether there is a genuine triable issue as to a material fact. In making that determination, the court is required to resolve all ambiguities, and to credit all factual

inferences that could rationally be drawn, in favor of the party against whom summary judgment is sought. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989); *Donahue v. Windsor Locks Board of Fire Commissioners,* 834 F.2d 54, 57 (2d Cir.1987). It is not the province of the court itself to decide what inferences should be drawn, *see, e.g., Cronin v. Aetna Life Insurance Co.,* 46 F.3d at 204; *Chambers v. TRM Copy Centers Corp.,* 43 F.3d at 38; if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper, *see, e.g., Stern v. Trustees of Columbia University,* 131 F.3d at 312; *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988). Guided by these principles, we review a district court's grant of summary judgment *de novo. See, e.g., Kerzer v. Kingly Manufacturing,* 156 F.3d 396, 400 (2d Cir. 1998); *Shumway v. United Parcel Service, Inc.,* 118 F.3d 60, 63 (2d Cir.1997).

 In determining the appropriateness of summary judgment, the court should not consider the record solely in piecemeal fashion, giving credence to innocent explanations for individual strands of evidence, for a jury, in assessing whether there was impermissible discrimination and whether the defendant's proffered explanation is a pretext for such discrimination, would be entitled to view the evidence as a whole. *See, e.g., Stern v. Trustees of Columbia University,* 131 F.3d at 314; *cf. Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) ("an invidious discriminatory purpose may often be inferred from the totality of the relevant facts").

 In the present case, the district court granted summary judgment dismissing the failure-to-promote claim because it found the evidence presented by Howley insufficient to establish that the Town's explanations were pretext. Our review of the record persuades us that in reaching this conclusion, the district court did not view the record as a whole in the light most favorable to Howley or give credit to permissible inferences that could be drawn in her favor as to each of the three reasons advanced by the Town for not promoting Howley.

First, the Town took the position that Howley was simply ineligible (an issue that goes not only to pretext but to whether Howley established a prima facie case) because she did not have four years of line-officer experience. The district judge stated that the Town was entitled to set its own criteria for the assistant-chief position. Indeed it is, but contrary to the district court's apparent inference, the criterion invoked had not been applied uniformly: the Town does not dispute that Wilcoxson and Cybart were appointed to assistant-chief positions without four years of line-officer experience. Although the Town states that it accepted other experiences of those two men as substitutes for line-officer experience, that very exercise of discretion demonstrates that application of the line-officer criterion was not uniform. Nor, especially in the case of Cybart, did the Town explain, in any way that could be thought conclusive as a matter of law, why the experience of the candidate receiving such dispensation was found to be an adequate surrogate for line-officer experience. For example, Fire Department Chief Macey, a member of the three-man committee that interviewed the candidates and hired Cybart, testified in deposition that he was unfamiliar with Cybart's experience in fighting major fires and did not know whether Cybart's job had ever placed him "on the scene in a command position over other firefighters" (Deposition of Roger Macey ("Macey Dep.") at 71). From the fact that the criterion was relaxed for two men in such circumstances, a rational factfinder would be entitled to

infer that Howley's failure to meet the criterion was not a genuine explanation for the Town's rejection of her.

Second, although the Town stated that Howley was eliminated from consideration based on the assessment panel's recommendations, the Town in other respects plainly did not follow the panel's recommendations. Of the top three candidates as ranked by the assessment panel, Cybart ranked third. In the six areas tested, Cybart was not ranked excellent in any, and his performance was found flawed in four. In two of those areas, for example, the panel suggested that Cybart needed better "technical knowledge regarding the operations of a fire department." (Assessment Panel Summary of Candidate #1 [Cybart] at 5.) Overall, Cybart's ranking was described by the panel as "on the low end" of "good" (*id.*); and it was less than 17% above the level designated "Barely Adequate, Less than Expected." The panel thus recommended Cybart only "with the [stated] reservations." (*Id.*) In contrast, the panel found a different candidate clearly superior to all other candidates and recommended him "with no reservations." The Town, however, hired Cybart. Plainly, it did not follow the panel's recommendation with respect to Cybart; and a jury could permissibly infer that that fact casts doubt on the Town's claim that the panel recommendation was a dispositive factor in its rejection of Howley.

Third, the Town's assertion that Cybart simply possessed the best qualifications for the job is called into question not only by the fact that of the three candidates recommended by the assessment panel he was ranked third, but also by the Town's indifferent exploration of his claimed credentials. Although Macey testified, "We went by [Cybart's] resume" (Macey Dep. at 71), the only résumé proffered by the Town is a December 1994 memorandum written by Cybart three months after he was hired. Further, Macey's testimony that the hiring committee "went by ... what [Cybart] presented himself as" (*id.*),

supports Howley's contention that the Town made no effort to verify Cybart's actual qualifications or his representation that he had been made chief of the Sikorsky fire brigade—a representation that would have been contradicted by the Sikorsky organization charts for the pertinent period, showing Cybart only as a lieutenant or as a deputy chief with limited staff.

In sum, Howley presented admissible evidence from which a rational juror could infer that none of the three explanations proffered by the Town was genuine. Accordingly, we conclude that summary judgment was improperly granted on the basis asserted by the Town and relied on by the district court, *i.e.*, that Howley produced insufficient evidence to create a triable issue as to whether the Town's explanations were pretext.

That said, however, it remains unclear whether Howley can present sufficient evidence that the Town's explanations were pretext for discrimination on the basis of gender. Typical indicia of such discrimination are not readily apparent. Howley was not passed over for a man she outscored; although Cybart was ranked only third among the six candidates and was not the candidate the assessment panel found outstanding, the record is clear that Howley ranked worse, fifth. And although Howley points out that the assessment panel—chiefs, deputy chiefs, and assistant chiefs from other municipal fire departments—was composed solely of men, she has pointed to no evidence of any gender bias on the part of the panel members. Nor has she presented any evidence that there were any high-ranking women fire officials who should have been members of the panel.

Howley appears to suggest that gender bias was shown by the Town's delay in responding to her application to take the examination, leaving her less time than the male candidates to prepare. However, the record includes a rejection letter from the Town to firefighter Dennis Cassia, a male

who, like Howley, had been demoted from the rank of lieutenant in the 1992 station-house closing. That letter, which is virtually identical to the rejection letter sent to Howley, bears the same date as the Town's letter to Howley.

Finally, the record is clear that Cybart was chosen not just in preference to Howley, who scored lower than he on the examination, but also in preference to two men who scored higher than he on the examination, one of whom had been recommended by the assessment panel without reservation. Thus, even if there may have been a hidden agenda in the Town's choice of Cybart, we have difficulty envisioning, on the record presented thus far, a reasonable inference that Cybart was chosen because he was a man.

In sum, although Howley produced sufficient evidence to create a genuine issue of fact as to whether the explanations advanced by the Town for rejecting Howley are pretextual, the burden remains on her to present evidence that the Town's explanations were pretext for discrimination on the basis of gender. Because the Town's summary judgment motion with respect to the denial-of-promotion claim asserted only that "there is no genuine issue as [to] the fact that the reasons articulated by the Town for denying the Plaintiff the promotion were legitimate, non-discriminatory and not pretextual" (Defendant Town of Stratford's Motion for Summary Judgment at 1), the summary judgment battle was focused squarely on the genuineness of the Town's explanations, not on what other motivation those explanations, if pretextual, might have masked. Given the focus of that motion, we remand for further proceedings on the matter of whether Howley can present admissible evidence of circumstances from which a rational juror could infer that Cybart was chosen in preference to her because of gender. In so doing, we do not foreclose the possibility that summary judgment dismissing the failure-to-promote claim may be appropriate if Howley fails to come forward with legally suffi-

cient evidence to support such an inference.

### B. *The Hostile–Work–Environment Claim*

■ In order to prevail on a claim that sexual harassment has caused a hostile work environment in violation of Title VII, a plaintiff must establish two elements. The first relates principally to the environment itself and its effect on the plaintiff; the second relates to the employer's response to a complaint about the environment.

■ First, the plaintiff must show that the workplace is permeated with "discriminatory intimidation, ridicule, and insult ... that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotation marks omitted); *see also Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir.2000); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Usually, a single isolated instance of harassment will not suffice to establish a hostile work environment unless it was "extraordinarily severe." *Cruz v. Coach Stores, Inc.*, 202 F.3d at 570; *see also Kotcher v. Rosa & Sullivan Appliance Center, Inc.*, 957 F.2d 59, 62 (2d Cir.1992). Thus, the plaintiff must demonstrate "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Cruz v. Coach Stores, Inc.*, 202 F.3d at 570 (internal quotation marks omitted); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) ("conduct must be extreme to amount to a change in the terms and conditions of employment"); *Carrero v. New York City Housing Authority*, 890 F.2d 569, 577 (2d Cir.1989).

However, "[t]here is neither a threshold magic number of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim." *Richardson v. New York State Department of Correctional Service*, 180 F.3d 426, 439 (2d Cir.1999) (internal quotation marks omitted).

[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Harris v. Forklift Systems, Inc.*, 510 U.S. at 23, 114 S.Ct. 367.

 Second, the plaintiff must show that "a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997); *see also Murray v. New York University College of Dentistry*, 57 F.3d 243, 249 (2d Cir.1995). When the source of the alleged harassment is a co-worker, the plaintiff must demonstrate that the employer " 'failed to provide a reasonable avenue for complaint or if it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.' " *Richardson v. New York State Department of Correctional Service*, 180 F.3d at 441 (quoting *Kracunas v. Iona College*, 119 F.3d 80, 89 (2d Cir.1997)); *see* 29 C.F.R § 1604.11(d) (1999) (employer is liable for co-worker harassment if "the employer (or its agents or supervisory employees)

knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action").

 The district court here, in granting summary judgment dismissing Howley's hostile-work-environment claim, stated simply that a single incident of verbal harassment is not sufficient, apparently without considering the totality of the circumstances. Yet, considering all the circumstances, Holdsworth's conduct could reasonably be viewed as having intolerably altered Howley's work environment, for Holdsworth did not simply make a few offensive comments; nor did he air his views in private; nor were his comments merely obscene without an apparent connection to Howley's ability to perform her job. Although Holdsworth made his obscene comments only on one occasion, the evidence is that he did so at length, loudly, and in a large group in which Howley was the only female and many of the men were her subordinates. And his verbal assault included charges that Howley had gained her office of lieutenant only by performing fellatio. It cannot be concluded as a matter of law that no rational juror could view such a tirade as humiliating and resulting in an intolerable alteration of Howley's working conditions: In an occupation whose success in preserving life and property often depends on firefighters' unquestioning execution of line-of-command orders in emergency situations, the fomenting of gender-based skepticism as to the competence of a commanding officer may easily have the effect, among others, of diminishing the respect accorded the officer by subordinates and thereby impairing her ability to lead in the life-threatening circumstances often faced by firefighters.

In addition, Howley presented evidence that Holdsworth had perpetrated repeated acts of harassment even after the April 1995 incident in order to undermine further her subordinates' respect for her, and hence to cast doubt on the degree of compliance and cooperation she could expect

from them. Thus, Howley stated in her affidavit that she had received calls from older firefighters expressing concerns, caused by untrue rumors emanating from Holdsworth, that she advocated operational procedures that would jeopardize their lives. Howley testified in deposition that she was told by one of Holdsworth's listeners that Holdsworth, while feigning reluctance to identify Howley by name, had referred to the "lieutenant" he impugned as "she"—a pronoun that was unique to Howley.

■■■■■ The Town suggests that some of the statements proffered by Howley would be inadmissible at trial. We agree that assertions made by Howley only on information and belief, for example, would not be admissible through her at trial, for testimony as to facts must generally be based on the witness's personal knowledge. Nor would testimony by Howley that other firefighters told her of certain statements by Holdsworth likely be admissible to prove that Holdsworth actually made such statements, for her testimony offered for that purpose would be hearsay. *See generally* Fed.R.Evid. 801; *but see id.* 803, 804 (exceptions to hearsay rule); *cf. Sarno v. Douglas–Elliman Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir.1999) (hearsay assertion that would not be admissible if testified to at trial is not competent material for a Rule 56 affidavit); *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir.1997) ("[I]t is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment."). Nonetheless, testimony by Howley's informants, on their own personal knowledge, that Holdsworth had made such statements would not be hearsay since that testimony would be offered not to prove the truth of his statements but only to prove that he made them. *See id.* 801(c) (statement not hearsay if not offered to prove the truth of the matter asserted). For the same reason, testimony by Howley herself that a number of her subordinates called expressing skepticism as to her competence would not be hearsay if offered not for the truth of the callers' assertions but only as proof that the calls and the statements were made.

■■■■■ In attempting further to minimize Howley's complaints of subsequent harassment by Holdsworth, the Town also states that Howley had not claimed any actual instances in which Holdsworth did not follow her orders at a fire scene but had stated only that Holdsworth "would not" (Howley Aff. ¶ 34(b)) do so. Although Howley's affidavit may be so read, we think it would be within the discretion of the trial court to allow Howley to testify to her opinion that Holdsworth would not likely follow her orders. *See generally Brady v. Chemical Construction Corp.*, 740 F.2d 195, 201 (2d Cir.1984) (trial court has discretion to allow helpful lay opinion testimony based on witness's observations). Even if that opinion were wrong, meaning that Holdsworth would in fact comply with Howley's orders, the present record permits an inference that Holdsworth has created a serious question as to whether he would comply and that the very existence of such a question may affect Howley's ability to perform her job. While a subordinate's refusal to follow a plaintiff's orders would not alone suffice to support a hostile-work-environment claim, in light of all the circumstances here the likelihood of insubordination by Holdsworth is at least relevant.

We note parenthetically that Howley's opinion as to Holdsworth's likely insubordination may well be buttressed by evidence of Holdsworth's personnel record, some of which is before us. The record includes a number of complaints as to Holdsworth's verbally abusive behavior (including affidavits from a female secretary and from a firefighter who had to restrain Holdsworth from physically assaulting the secretary after she objected to Holdsworth's use of foul language), his acts of insubordination, and at least two instances of his cavalier on-scene conduct that may have jeopardized the lives or

property of persons he was supposed to help.

Finally, although the Town takes the position that all of the alleged incidents between Howley and Holdsworth subsequent to April 12, 1995, are simply irrelevant, we disagree. Given the contents of Holdsworth's April 12 barrage, a factfinder would be entitled to infer that any harassment Holdsworth directed at Howley thereafter, with or without obscenities, was gender-based. Further, leaving aside any questions as to the form of evidence presented to show that such incidents occurred, the fact that they continued and were gender-based, if proven, is relevant to the question of the appropriateness of the Town's response to Howley's complaints.

Even without evidence as to the subsequent incidents, however, we are persuaded that Howley presented sufficient evidence to withstand summary judgment with respect to the second element of her hostile-work-environment claim, i.e., that the Town's response to her complaint about Holdsworth's harassment was inadequate. Howley complained to her superior officer on the night of Holdsworth's verbal assault and filed a written complaint the next day; the harangue was witnessed by a roomful of Howley's colleagues; and Holdsworth did not deny making any of the statements attributed to him. The Town took five weeks to mete out any discipline whatever. When the Town did act, it issued a two-day suspension and merely "recommended" that Holdsworth apologize to Howley and to the firefighter group. Holdsworth did not apologize, and the record does not suggest that the Town took any action to persuade him to do so. Because the ordinary dangers of the profession involve emergency situations in which firefighters must rely on each other and have confidence in their commanding officers, the Town's failure to take any remedial action, other than a weekend suspension and a "recommend[ation]" for apology, to remedy Holdsworth's public attempt to undermine Howley's authority may be viewed as an inappropriate response.

Further, we note that when Howley complained of Holdsworth's ensuing acts of harassment, the Town did not concede even that Holdsworth's April 12, 1995 conduct constituted sexual harassment. Notwithstanding Holdsworth's having repeatedly called Howley a slang term for the female sex organ, having repeatedly referred to her menstrual cycle, and having suggested that she had achieved her lieutenancy only by performing sexual favors, the Town stated that its position was that Holdsworth had merely engaged in " 'conduct unbecoming' an officer, *not sexual harassment.*" (Memorandum of Town Manager Mark S. Barnhart to Howley dated December 24, 1997, at 1 (emphasis added).) Reasonable minds could draw the opposite inference.

We conclude that, although not all of the evidence cited by Howley in support of her hostile-work-environment claim was proffered in a form that would be admissible at trial, she presented sufficient admissible evidence to prevent the summary dismissal of that claim. Accordingly, we remand for trial of the hostile-work-environment claim.

## CONCLUSION

We have considered all of the Town's contentions in support of summary judgment and have found them to be without merit. The judgment of the district court is vacated insofar as it dismissed Howley's claims under Title VII and state law; the matter is remanded to the district court for trial of the hostile-work-environment claim and for further proceedings, consistent with this opinion, on the failure-to-promote claim.

Costs to plaintiff.