Ellen FITZGERALD, Plaintiff,

v.

**FORD MARRIN ESPOSITO WITMEYER & GLESER, L.L.P., Defendants.**

**No. 96 CIV 7491 (TPG).**

United States District Court, S.D. New York.

Feb. 27, 2001.

Debra L. Raskin, Anne Clark, Vladeck, Waldman, Elias & Engelhard, P.C., New York City, for plaintiff.

Joyce London, Paul Majkowski, Ford Marrin Esposito Witmeyer & Gleser, L.L.P., New York City, for defendant.

### AMENDED OPINION

GRIESA, District Judge.

In this action plaintiff Fitzgerald sues for sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* At the trial before a jury, Fitzgerald asserted two claims of sex harassment against defendant Ford Marrin—(1) the creation of a hostile work environment, and (2) constructive discharge. The jury found for Fitzgerald on the first claim and against her on the second. The jury awarded $80,000 in compensatory damages on the first claim, but declined to award punitive damages.

Following the verdict, Ford Marrin moved for judgment as a matter of law setting aside the verdict on the first claim, or, in the alternative, for a new trial. At the oral argument the court denied the motion for a new trial, a ruling which the court now confirms. The court reserved decision on the motion for judgment as a matter of law. The latter motion is the subject of the present opinion.

For the reasons to be explained, the court grants Ford Marrin's motion to have the court enter judgment as a matter of law setting aside the verdict holding it liable for creation of a hostile work environment. The court notes that the jury's findings on this subject occurred in two phases. First, the jury found that there was a hostile work environment at Ford Marrin and that it was created by a partner alone or in conjunction with associates. Second, the jury found that Ford Marrin had not shown reasonable care to prevent and correct sexually harassing behavior and had not shown any neglect by Fitzgerald to take advantage of preventive or corrective avenues or to otherwise avoid harm. This second finding related to the issue of whether the firm could be liable for a hostile work environment created by certain persons at the firm. In ruling on the present motion the court is setting aside the first finding as to the existence of a hostile work environment. There is no need to deal with the second finding, because it assumed the first, which is now set aside.

The factual issues in this case were and still are hotly contested, with difficult questions of credibility. In fact, there have been two trials. The first resulted in a mistrial. It was only in the second that the jury was able to agree.

The court wishes to make it clear at the outset that the verdict of the jury is supported by sufficient evidence on the facts. What the court is referring to relates to the issues regarding whether persons at Ford Marrin engaged in the conduct alleged by Fitzgerald. The jury did not, of course, make detailed findings on Fitzgerald's specific contentions, but rather answered certain conclusory questions necessary to establish liability for hostile work environment. Nevertheless, for the sake of deciding the present motion it will be

assumed that the jury resolved the essential factual issues in favor of Fitzgerald. On the evidence presented, the jury was justified in doing so.

What remains as an issue is whether Fitzgerald's version of the facts does or does not add up to a valid case of hostile work environment under the law. The discussion of the law will appear later in this opinion. However, there is a point which needs to be made at the outset. After reviewing the briefs on the present motion, the court requested each side to provide the decision or decisions most closely in point factually in relation to the present case, as well as factual summaries of as many additional cases as they wished to refer the court to. This turned out to be a most useful exercise. Neither side could refer the court to a case really in point on its facts. The parties brought the attention of the court to a host of decisions. But all of them, without any exception, dealt with conduct substantially different in its nature and severity from what Fitzgerald claims to have occurred in the present case. This means that this is a case of first impression.

### Facts

The following statement is based on Fitzgerald's version of the facts, except to the extent that Ford Marrin's evidence is uncontradicted. In fairness it must be emphasized that Ford Marrin's witnesses fervently disputed Fitzgerald's factual contentions. The issues of credibility were unusually difficult. Fitzgerald is an attorney, and her two principal corroborating witnesses, Suzanne O'Neil (Suzanne Bernard when she was at Ford Marrin) and Katherine Scott, are attorneys, and they were all associates together at Ford Marrin. As far as one can tell they are professional persons of high character. At the same time, Ford Marrin is a successful law firm, in which the partners and associates are hard-working professionals of high character. On the essential issues, the testimony of the two sides was in direct conflict. The jury was instructed on the applicable preponderance of the evidence standard, and found for plaintiff.

Fitzgerald graduated from law school in 1990, worked for a New York law firm, then a Connecticut law firm for family reasons, and started at Ford Marrin in November 1993. At this time she was 29 years old. She remained at Ford Marrin until February 1995, when she resigned to go to another law firm.

During Fitzgerald's stay at Ford Marrin there were 9 partners, one of whom was a woman. There were 15 associates, three of whom (including Fitzgerald) were women. A fourth woman associate was added at some point, bringing the total number of associates to 16.

### Hostile Work Environment

The sexual harassment alleged by Fitzgerald consisted of conduct which, for purposes of this opinion, will be considered in two categories. *First,* there were conversations and remarks about sex by male associates not directed at Fitzgerald, but which Fitzgerald overheard. She says that this kind of thing continued throughout her stay at Ford Marrin. Her allegations in this regard are directed mainly at associates James Adrian, David Beke and Michael Tricarico. *Second,* there were certain incidents of conduct directed at Fitzgerald. Under this second category, Fitzgerald makes her accusations against partner Michael Anania, and at the associate level, principally against James Adrian.

Although Fitzgerald does not accuse any partner except Anania of the offensive conduct, she does allege that other partners heard or observed at least some of such conduct.

The court will now elaborate to some extent on the evidence regarding the two categories, starting with the first.

a. *Associates' Talk*

Fitzgerald and her two supporting witnesses, O'Neil and Scott, and the accused male associates, were essentially contemporaries in age and in their time in the practice of law. Both these female and these male associates were well educated, generally well mannered and had remarkably likeable and attractive personalities. Moreover, except for a temporary coolness between Fitzgerald and one of the male associates, David Beke, they all existed at the firm on a most friendly basis. For instance, one of the accused associates, Michael Tricarico, has testified without contradiction that Fitzgerald was his closest friend at the firm and that when they were both in the office they talked daily and frequently lunched together. O'Neil testified that the male associates were generally very nice and that she liked them.

Nevertheless, Fitzgerald accuses certain of the male associates of open talk about sex which was acutely offensive to her as a woman. Fitzgerald was exposed to this talk and heard it, but did not participate. Fitzgerald testified that the sexual talk which she heard and deemed offensive occurred two or three times a week during the entire time she was at the firm.

According to Fitzgerald's evidence, Adrian, Beke and Tricarico, occasionally joined by one or two other male associates, talked about "sex lives" and told jokes about sex and women. At least two of them were not married and there was talk about their sexual prowess and whether they were "getting any." They speculated about the sex lives of certain partners, including speculation about possible homosexual activity with associates on business trips. There was joking about masturba-tion in slang terms. Slang words for the male sex organ were part of the conversation. The word "fuck" was uttered—for instance, when a copy machine malfunctioned.

The conversations about sex and the sexual jokes would take place to some extent at lunch in the lunchroom. But O'Neil testified that the conversation became "quite vulgar" in the evening, when the associates had worked a long day and after most of the staff had left; and that, as the office got emptier and emptier, and people felt freer and freer, "people's conversations loosened up as time went on." The sexual talk among the male associates at times took place in halls or in the offices of these associates and this was usually in the evening when there were not a lot of people around.

The sexual conversations were in a "humorous context," in O'Neil's words, and "nonsensical" as Scott put it. As indicated by O'Neil, they were a form of relaxation from intense work. Basically Fitzgerald's evidence about the male associates' talk is that they intended to have fun among themselves by talking and joking about sex.

The sexual conversations and remarks by the associates described thus far, falling into what the court refers to as the first category, were not about Fitzgerald. They did not contain comments about her or her person. Nevertheless, Fitzgerald's witnesses testified that occasionally the male associates showed a realization that they were embarrassing Fitzgerald.

As already stated, there were three male associates named by Fitzgerald and her two supporting witnesses as the principal sources of the sexual talk described above, joined in a few instances by one or two others. This total number of four or five was part of an associate population of

15 and later 16. Moreover, Fitzgerald has testified that at least two of the male associates, James Aiosa and Artemis Lekakis, were offended by the talk.

### b. *Conduct Directed At Fitzgerald*

The second category of allegations relates to conduct directed at Fitzgerald. The incidents she relies on will now be summarized, except for what is too trivial to recount.

The associates at Ford Marrin worked in teams under the supervision of a partner. Fitzgerald was in the team headed by partner Michael Anania. Fitzgerald testified that on three occasions Anania referred to her by terms meaning lesbian. She testified that after the first occasion Adrian and some associates did the same for a short time. According to Fitzgerald—

(1) In April or May of 1994 Fitzgerald was in Anania's office discussing a case. It appears that a person connected with the firm's client was a known lesbian. Anania referred to this person and stated, "She's a dyke, kind of like you, Ellen," laughing as he did so. Partner William Ford was present and said nothing.

(2) After Anania had called her dyke and she "had shared that with Jim Adrian," Adrian referred to her half a dozen or so times as butch, including saying over the office intercom, "Butch, go to the kitchen." Another associate called her butch once. O'Neil testified that male associates used the terms butch or dyke to Fitzgerald in a teasing way, knowing that it made her uncomfortable, and that it was a way of joking around with her, although, on further questioning, O'Neil could specifically recall only Adrian doing it. Scott testified that for a time the male associates referred to Fitzgerald as butch outside of her pres-

ence, and that this went on for a couple of weeks. Scott told one of the associates that Fitzgerald was bothered by this conduct, and it stopped.

(3) In June 1994 Anania observed Fitzgerald in a pants suit, and said that her attire was unprofessional. Fitzgerald disagreed and said, "You know it's completely professional." She was then leaving the office, and Anania said, "Well, when are you coming back, butch?" He laughed as he did so.

(4) On the third occasion, in September 1994, Fitzgerald led off the conversation by calling *herself* "butch" while that she planned to wear pants to an upcoming wedding. Anania responded by saying he had never called her that, but then did address her as butch and burst out laughing.

(5) In the course of this exchange, Adrian suggested that Fitzgerald wear something black and lacey.

Fitzgerald testified that the following incidents involving Adrian constituted part of the sexual harassment she experienced. According to Fitzgerald—

(1) Adrian had ordered Japanese finger food for dinner in the lunchroom and asked Fitzgerald, in a sarcastic and demeaning tone, if she wanted to lick his fingers. O'Neil thought that Adrian was referring to the Kentucky Fried Chicken slogan—"Finger–Lickin' Good."

(2) Once when Fitzgerald and a paralegal were going out to dinner, Adrian said that they must be going out slumming to pick up men.

(3) On one occasion Adrian was changing clothes in his office and came out into the hall pulling up his pants so that Fitzgerald saw him in his boxer shorts.

(4) In the summer of 1994 Fitzgerald had a sweater on because of the air

conditioning. She walked by Adrian's office and he said, "That isn't slutty enough." He then said, "Oh, I slipped." Fitzgerald testified that Adrian was laughing and to him it was "a joke," although she felt humiliated.

(5) Around Labor Day of 1994, when Fitzgerald returned from vacation at Martha's Vineyard, she received an e-mail from Adrian saying, "If Nantucket boy isn't getting it done, I can take care of you."

(6) Every other week or so Adrian would make a "cat call" or a "wolf whistle" at Fitzgerald, like the noise made by construction workers when an attractive woman walks near a construction site.

Fitzgerald testified that the following additional incidents involving Anania occurred.

(1) At Fitzgerald's performance evaluation in December 1994 Anania said that Fitzgerald should be more aggressive and should be more like Adrian, remarking that if Adrian goes into a bar to pick up a woman and one turns him down he goes on to the next.

(2) A partner by the name of Cushing O. Condon gave a Christmas party for associates in December 1994. After the party Anania asked Fitzgerald if there was any cock-twisting at the party, which Fitzgerald interpreted as referring to the male sex organ and as a play on Condon's initials—"COC." Not long afterwards in the lunchroom, and in the presence of managing partner Thomas P. Esposito, Anania asked Fitzgerald if she could "tell us about the cock-twisting at the party." Both Anania and Esposito were laughing.

At no time did any partner or associate at Ford Marrin make sexual advances to Fitzgerald or attempt to touch her in a sexual way or fondle her. There was no pursuit of her to establish a sexual or romantic relationship. No comments were addressed to her about her body or any part of her body.

### c. *Effect on Fitzgerald*

Fitzgerald testified that the general talk and remarks of certain associates which she heard in the office, and the remarks and conduct directed at her, caused her, beginning about March 1994, to have headaches and to lose sleep; and that she was also adversely affected at work in her morale and her ability to concentrate. Fitzgerald was sufficiently offended by the sexual conversation in the lunchroom that she greatly reduced her attendance there, as did O'Neil and Scott.

### *Other Interactions With Attorneys*

In order to place the evidence described above in context, it is necessary to discuss other evidence regarding the interactions between Fitzgerald and the persons she ultimately accused in the lawsuit. This evidence is uncontradicted except on one point, which is noted.

Tricarico testified that Fitzgerald was his closest friend at the firm and that they regularly talked with each other on a variety of subjects, including personal matters. He would often have lunch with Fitzgerald either in or away from the office. Adrian and Fitzgerald were friends at the firm, and since Adrian had more experience at the firm than Fitzgerald, she often asked him about legal issues regarding cases she inherited from him and others. She also asked him for personal favors, which he performed. There was also a friendly relationship between Fitzgerald and Beke, until an incident which will be described and which had nothing to do with the sexual talk. All this went on during the time when Fitzgerald says that she was being subjected to the sexual harassment.

On various occasions Fitzgerald would go to bars for drinks with attorneys at the firm, including Adrian, Beke and Tricarico. The bars which they patronized were St. Maggie's, North Star Pub, and Jeremy's, the latter being "very rough," with women's underwear hanging from the ceiling. On three occasions drinks were followed by Fitzgerald going with Beke and a few others for dinner, and once dinner was followed by a visit to a club on the East Side named "Live Psychic," where people climb up ladders and dance in a cage. Fitzgerald danced with Beke.

In July 1994, on Beke's birthday, Fitzgerald and others had drinks with him at St. Maggie's and then, after a plan for dinner with two other people fell through, Fitzgerald and Beke went to his apartment, where they kissed each other. Fitzgerald testified that shortly thereafter Beke intruded into the bathroom while she was there, after which Fitzgerald left Beke's apartment. Beke denied the bathroom incident and testified that after the kissing, which she initiated, he did not want to proceed further and took her to a cab. In any event, the two did not thereafter mingle socially until Fitzgerald was about to leave the firm. According to Fitzgerald this was because of her anger at Beke's behavior, but defense witnesses said that Fitzgerald manifested anger at Beke's unwillingness to date her. This is not an issue which the court assumes the jury resolved, and the court need not discuss it further. Plaintiff does not base any part of her claim of sexual harassment on the alleged bathroom incident.

In August 1994 Fitzgerald brought back from her vacation materials about a golf course and places to stay in Martha's Vineyard. She gave these to Anania, who was an avid golfer. In September 1994 she and another associate in Anania's team took Anania to lunch to celebrate his 40th birthday.

During her last week at the firm, a group of her fellow associates gave Fitzgerald a going-away dinner. However, a few of the associates, including Adrian and Beke, could not attend the dinner, and the night before they took her for drinks at "Mad 61" on Madison Avenue. Fitzgerald said of her hosts, whom she would later accuse in the lawsuit, "They wanted to wish me well. . . . I thought it was a nice gesture." They picked up a bill for $140.

The next night a group, including Tricarico, took Fitzgerald for dinner. After dinner she walked uptown with Tricarico and another male associate, and the three had a drink at a bar on Central Park South, after which they went to Tricarico's apartment, where they played recordings of the "Jerky Boys," which had sexual content as bad or worse than the sexual talk alleged by Fitzgerald as occurring at the office. Fitzgerald joined in the laughter at these recordings.

The testimony of Fitzgerald and her supporting witnesses was that on the social occasions after work the offensive sexual talk by male associates did not take place.

Fitzgerald sought assistance in personal matters from the associates and they readily gave her such assistance. In April 1994 Adrian helped Fitzgerald with an issue about her income tax. Later, shortly after Labor Day 1994, Fitzgerald asked Adrian to help her break a lease and obtain the refund of a deposit. Adrian said that he would do this on his own time. He worked out an accommodation for Fitzgerald with the landlord. When Fitzgerald was leaving the office she asked him to use a connection of his to obtain theater tickets for friends coming from New Haven. When the friends' plans changed, Adrian was asked to arrange a change of the

tickets. He was not able to do this, although he tried.

In September 1994 Fitzgerald asked Tricarico to drive her to a wedding in New Jersey, which they were both attending. Tricarico replied that this would involve considerable extra driving, but agreed to assist her. On the return trip, Tricarico drove out of his way to her home in Brooklyn, arriving at about 1:00 a.m., the night before he was catching a morning plane for a business trip. When Fitzgerald moved to a new apartment on the upper East Side in late 1994, Tricarico, at her request, went with her to get the keys from the superintendent of the new building. Later, when Tricarico was renovating his new East Side apartment, he discussed the renovations with Fitzgerald and she visited his apartment so that he could show her the renovations and new furniture.

Shortly after Fitzgerald left the firm she gave Tricarico a housewarming gift for his new apartment with a note saying, "Welcome to the neighborhood. Love, Ellen."

*Fitzgerald's Departure*

Fitzgerald's legal work did not live up to the requirements of the demanding Ford Marrin firm. When the partners were reviewing her work in December 1994 the views were sharply negative. Her team leader Anania stated that he would not work with her any longer. Ford, however, said in effect that he would take her under his wing because he wanted to try to have the firm succeed with Fitzgerald and vice versa. Fitzgerald was to be given a raise in salary, although not as much as the raise given to Adrian, who was viewed as more productive. Fitzgerald was told of her need to improve, of her transfer to Ford, and of the amount of her raise. Fitzgerald immediately communicated with another firm which had interviewed her at an earlier stage, and went with that

firm in February 1995. In support of her claim for constructive discharge, Fitzgerald testified that the reason for her leaving had nothing to do with her negative performance review but only with the sexually charged work environment. The jury obviously disbelieved this assertion in denying her constructive discharge claim.

*Failure to Complain*

There was considerable evidence at the trial about whether Fitzgerald should have complained and whether Ford Marrin had circulated, or posted a policy regarding sexual harassment. This evidence largely related to the question of whether the Ford Marrin firm would be liable in the event that the jury found a hostile work environment. The jury's finding on the existence of a hostile work environment is being set aside on the present motion, making an analysis of the further questions regarding the firm's liability unnecessary on this motion. However, a brief summary of the evidence about Fitzgerald's failure to complain and about the issue of the sexual harassment policy will be presented.

Fitzgerald testified that beginning about March 1994, as a result of the hostile work environment, she was experiencing headaches, loss of sleep, and problems at work with morale and ability to concentrate. By the fall of 1994 the environment made it hard to get her work done. However, when she was given a negative performance evaluation in December by Anania and Ford, and when Ford decided to have Fitzgerald work for him in the hope of resolving her problems, Fitzgerald said nothing to Anania or to Ford about her morale and concentration at the office suffering because of the abusive sexual talk, and it being hard for her to get her work done. She was, however, at about this time considering a lawsuit, which she discussed with O'Neil and Scott. Neverthe-

less she said nothing to Ford or any other partner about a problem which might give rise to a lawsuit. At no time during her tenure at Ford Marrin did she complain to a partner about anything relating to what she later sued about.

Fitzgerald explained that her failure to complain to a partner or partners resulted from the fact that certain partners had observed the misconduct and done nothing, thus indicating that a complaint by her would be useless.

Of course, the evidence showed that male associates were the principal perpetrators of the claimed harassment. If the sexual discussions and remarks of the associates could have been stopped or brought within bounds, the situation she complains about would have largely disappeared. Although there was testimony that at times Fitzgerald evidenced embarrassment, there was no evidence that the accused male associates had any idea that they were causing Fitzgerald the problems which she now claims resulted from their conduct. There was certainly no evidence that these male associates were aware that she regarded their conduct as sexual harassment or as creating a hostile work environment. Fitzgerald testified that on one occasion, during the 15 months, during a sexual discussion between Beke and Tricarico, she said, "That's enough," or "Knock it off," and that they failed to do so. But Fitzgerald did not speak further about the issue or say anything to indicate any problems she was experiencing.

*The Sexual Harassment*

*Policy Issue*

Ford Marrin introduced a document entitled "Sexual Harassment Policy," which Ford Marrin asserted was in effect during the time Fitzgerald was at the firm. It contained appropriate prohibitions which were as strict, or perhaps stricter, than what was legally required, and provided the names of partners to whom complaints could be made. Ford Marrin's witnesses testified that this policy was posted on an accessible bulletin board. Fitzgerald and O'Neil testified that they never saw such a policy on the bulletin board or elsewhere and knew nothing of it. Scott did not testify on the subject. For reasons which need not be described in detail, the evidence was not favorable to Ford Marrin on the issue of whether the policy was posted while Fitzgerald was at the firm. However, in view of the court's ruling on other issues, further discussion of the sexual harassment policy matter is not necessary.

*The Trial*

The trial of the action commenced on May 30, 2000 and concluded June 9, 2000. On the hostile work environment issue the jury was instructed in accordance with the legal standards to be described later in this opinion. The first interrogatory to the jury asked if the jury found that there was a hostile work environment at Ford Marrin altering the terms or conditions of Fitzgerald's employment. The jury answered Yes. The jury was then asked if the hostile work environment was created by associates only or by "a partner alone or in conjunction with associates." The jury answered No to the first alternative and Yes as to the second. The jury was then asked if Ford Marrin had shown reasonable care to prevent and correct promptly any sexually harassing behavior and had shown that Fitzgerald unreasonably failed to take advantage of preventive or corrective opportunities provided by Ford Marrin or to otherwise avoid harm. This question was in accordance with the Supreme Court decisions in *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141

L.Ed.2d 662 (1998). The jury answered No. The jury awarded $80,000 in compensatory damages and declined to award punitive damages. The jury rejected Fitzgerald's claim that she was constructively discharged.

### Discussion

On the present motion the court will deal solely with the finding of the jury that there was a hostile work environment at Ford Marrin—*i.e.*, the Yes answer to the first interrogatory. Since, for reasons to be described, the court determines that this finding should be set aside, the court will have no reason to go farther and deal with the further findings of the jury based on their finding of a hostile work environment.

Before submission to a jury, a motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50 may be granted against a party on an issue if "there is no legally sufficient evidentiary basis for a reasonable jury to find for the party." Fed. R.Civ.P. 50(a). The same standard governs a renewed motion for judgment as a matter of law after a jury verdict. Fed. R.Civ.P. 50(b); *Raspente v. National R.R. Passenger Corp.*, 111 F.3d 239, 241 n. 3 (2d Cir.1997). In determining a motion under Rule 50, the court must view the evidence in the light most favorable to the non-moving party, and give her the benefit of all reasonable inferences from the evidence that the jury might have drawn in her favor. *Padilla v. Metro–North Commuter R.R.*, 92 F.3d 117, 122 (2d Cir.1996). If, after this is done, there is no "legally sufficient" basis for a finding in favor of the non-moving party on the issue in question, the motion must be granted.

In dealing with the present motion, the court assumes the correctness of Fitzgerald's version of the facts. The court undertakes to decide whether these facts are a basis, as a matter of law, for finding the existence of a hostile work environment.

The present case is brought under a provision in Title VII of the Civil Rights Act of 1964, which states:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; ...

42 U.S.C. § 2000e–2(a).

The statute does not literally deal with sexual harassment. However, the courts have long held that sexual harassment is a form of sex discrimination. The courts recognize two categories of sexual harassment in the workplace as a basis for Title VII liability—*quid pro quo* harassment and harassment creating a "hostile work environment." The claim in this case is a hostile work environment claim.

Certain Supreme Court decisions have set forth the authoritative law in hostile work environment cases, and need to be examined carefully to determine whether there is a valid claim in the present case.

In *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the plaintiff alleged that her supervisor made repeated demands upon her for sexual favors, in response to which she had intercourse with him some 40 or 50 times. There was also evidence that the supervisor fondled her in front of other employees and that he raped her on several occasions. The defendant presented contrary evidence and contended that, in any event, there was no valid claim because there was no tangible loss of an economic character. The Supreme Court held that no such loss need be shown, finding that the congres-

sional intent in Title VII was to strike at the entire spectrum of disparate treatment of men and women in employment. *Id.* at 64, 106 S.Ct. 2399. The Court went on to enunciate certain definitions, which have become basic rules in hostile environment cases. The Court stated that Title VII "affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Id.* at 65, 106 S.Ct. 2399. Mere utterance of an epithet which engenders offensive feelings is not enough to create liability. In order for sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Id.* at 67, 106 S.Ct. 2399. The Court held that the plaintiff's claim in that case was legally sufficient.

In *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the plaintiff was often insulted by the company president because of her gender and was made the direct target of unwanted sexual innuendos, all in the presence of other employees. In front of other employees, the president suggested that he and the plaintiff go to a hotel to negotiate the plaintiff's raise. The president occasionally asked the plaintiff and other female employees to get coins out of his front pants pocket, and he would throw objects on the ground in front of the plaintiff and other women, asking them to pick the objects up. He made sexual innuendos about the plaintiff's and other women's clothing. In the presence of other employees, the president asked the plaintiff if she had promised sex to a customer in order to arrange a deal. Following findings to this effect by a magistrate, the district court dismissed the case on the ground that there was no sufficient showing of psychological consequences. The court of appeals affirmed. The Supreme Court reversed and remanded. The Court reiter-

ated the points made in *Meritor,* stating that Title VII is violated when the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. *Id.* at 21, 114 S.Ct. 367. The Court made it clear that conduct that is "merely offensive" is not enough to violate Title VII. *Id.* at 21, 114 S.Ct. 367. However, the Court held that so long as the work environment "would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it also to be" psychologically injurious. *Id.* at 22, 114 S.Ct. 367. The concept of "abuse" was emphasized by the Court in using the phrases "discriminatorily abusive work environment" and "work environment abusive to employees because of their … gender" to describe what sort of environment violates Title VII. *Id.* at 22, 114 S.Ct. 367. Finally, the Court stated that a determination of whether an environment is hostile or abusive can only be made "by looking at all the circumstances."

> These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Id.* at 23, 114 S.Ct. 367. The Court in *Harris* did not actually hold that the conduct violated Title VII, but remanded for the application of the proper standard.

*Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), dealt with the question of whether a sexual harassment claim under Title VII could be made by a male who was lodging accusations against other males. The Court held that it could. In this case a man employed on an oil plat-

form claimed that his male co-workers forcibly subjected him to various kinds of physical actions of a humiliating and sex-related nature, and once threatened him with homosexual rape. The Court reiterated the teaching of prior Supreme Court decisions that Title VII liability requires a showing that the workplace "is permeated with discriminatory intimidation, ridicule and insult" and that this must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* at 78, 118 S.Ct. 998. The Court stressed that Title VII is not to be expanded "into a general civility code." *Id.* at 81, 118 S.Ct. 998. Workplace harassment is not "automatically discrimination because of sex merely because the words used have sexual content or connotations." *Id.* at 80, 118 S.Ct. 998. To recover under Title VII, the plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations," but actually constituted discrimination because of sex. *Id.* at 81, 118 S.Ct. 998. "[O]rdinary socializing in the workplace—such as male-on-male horseplay or intersexual flirtation" should not be mistaken for discriminatory conditions of employment. *Id.* at 81, 118 S.Ct. 998. The Court stated that "the objective severity of harassment" should be judged based upon a consideration of all the circumstances, and that there must be "careful consideration of the social context in which particular behavior occurs." *Id.* at 81, 118 S.Ct. 998. The Court used the phrase "severely or pervasively abusive" in discussing whether the working environment is such as to violate Title VII. *Id.* at 81, 118 S.Ct. 998. The following comment, although dealing with "same sex" harassment, is of general interest.

The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

*Id.* at 81–82, 118 S.Ct. 998. The Court cited a statement in Justice Ginsburg's concurring opinion in *Harris* that the critical issue is "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." 510 U.S. at 25, 114 S.Ct. 367.

In *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), the plaintiff was a female lifeguard. Her male supervisors engaged in unwanted touching of the plaintiff and other female lifeguards in a sexually degrading manner, commented on their bodies, and talked about their desire to have sexual relations with them. The decision dealt mainly with the question of what circumstances would cause an employer to be liable under Title VII for sexual harassment committed by a supervisory employee. However, the Court also provided further guidance on what constitutes sexual harassment and hostile work environment in violation of Title VII. According to the decision, the Supreme Court had already "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment." *Id.* at 788, 118 S.Ct. 2275. Discourtesy or rudeness should not be confused with actionable harassment. *Id.* at 787, 118 S.Ct. 2275 The standards set by the Supreme Court "for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Id.*

at 788, 118 S.Ct. 2275. The standards, properly applied "will filter out complaints attacking 'the ordinary tribulations of the workplace, such as sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Id.* at 788, 118 S.Ct. 2275. The quotation is from B. Lindeman & D. Kadue, Sexual Harassment in Employment Law, 175 (1992).

In *Faragher* the Court cited two court of appeals opinions as illustrations of compliance with the proper standards. *Id.* at 788, 118 S.Ct. 2275. These two cases are *Carrero v. New York City Housing Auth.,* 890 F.2d 569 (2d Cir.1989) and *Moylan v. Maries County,* 792 F.2d 746 (8th Cir. 1986). In *Carrero* the Second Circuit held that there was a valid claim of hostile work environment in a situation where a supervisor made repeated unwelcome sexual advances to the plaintiff, which were not only unasked for and unacceptable, but were coerced, since they were inflicted by the plaintiff's immediate superior. 890 F.2d at 578. In *Moylan* the Eighth Circuit upheld a sexual harassment claim where the evidence showed that the plaintiff's superior, a sheriff, repeatedly came into the plaintiff's office and made sexual advances, including fondling and kissing her, and trapped her in an office in the courthouse where he raped her. 792 F.2d at 750.

█ Isolated instances of harassment will usually not suffice to establish a hostile work environment. Rather, the plaintiff must show either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her employment. *Howley v. Town of Stratford,* 217 F.3d 141, 153 (2d Cir. 2000); *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000).

█ In order to recover for sexual harassment a plaintiff must make out a case both objectively and subjectively—

*i.e.,* must show that the working environment was one that a reasonable person would find abusive, and one that the victim subjectively perceived to be abusive. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Usually the first inquiry is whether the workplace is abusive under the objective standard, and it is this inquiry which the court is dealing with on the present motion. Unless the workplace is found to be objectively abusive there can be no recovery.

The most recent Second Circuit decision regarding sexual harassment and hostile work environment is *Howley v. Town of Stratford,* 217 F.3d 141 (2d Cir.2000). This case is relied on by Fitzgerald, but the facts are sharply different from those in her case. The plaintiff was a firefighter and the only woman in the town's force of 100. She was a lieutenant. A controversy arose as to whether two persons should be admitted to the benevolent association. The plaintiff opposed admission. Another lieutenant, Holdsworth, junior to the plaintiff, was in favor. At a meeting of the association, Holdsworth yelled out a series of obscene insults at the plaintiff, of a degree of filth beyond what the court is willing to quote in this opinion. After the meeting Holdsworth did not again confront the plaintiff with obscene epithets, but he attempted to diminish her authority by a variety of means. The district court granted summary judgment to defendants on the ground that the alleged harassment essentially involved only one incident. The court of appeals reversed. Referring to the meeting at which the obscene attack was made, the court stated:

> . . . considering all the circumstances, Holdsworth's conduct could reasonably be viewed as having intolerably altered Howley's work environment, for Holdsworth did not simply make a few offen-

sive comments; nor did he air his views in private; nor were his comments merely obscene without an apparent connection to Howley's ability to perform her job. Although Holdsworth made his obscene comments only on one occasion, the evidence is that he did so at length, loudly, and in a large group in which Howley was the only female and many of the men were her subordinates. And his verbal assault included charges that Howley had gained her office of lieutenant only by performing fellatio. *Id.* at 154. The court went on to state that Holdsworth's attack could have had the effect of diminishing the respect for the plaintiff among the firefighting force and impairing her ability to lead. The court also noted that Holdsworth's campaign against the plaintiff continued after the meeting and that this could be viewed by a factfinder as gender related.

In *Cruz v. Coach Stores, Inc.*, 202 F.3d 560 (2d Cir.2000), there was a claim of hostile work environment involving both race and sex. On the sexual aspect of the case, the plaintiff claimed that her supervisor made repeated remarks such as saying that women should be barefoot and pregnant, that the supervisor would stand very close to women employees when talking to them and would look them up and down, and that he would back the plaintiff against a wall while talking to her until she cut off the conversation in order to extricate herself. *Id.* at 571. In reversing the district court's grant of summary judgment to the defendant, the court of appeals stated that a reasonable jury could conclude that the supervisor physically harassed the plaintiff regularly throughout her employment in a manner that was hostile to her because of her sex. *Id.* at 572. The court went on to state that the "crucial inquiry focuses on the nature of the workplace environment as a whole." *Id.* at 570. The court concluded that the facts alleged by the plaintiff regarding the behavior of her supervisor "brings this case over the line separating merely offensive or boorish conduct from actionable sexual harassment." *Id.* at 571.

It is now necessary to apply these rules and definitions from the authoritative decisions to the facts of this case. In this connection, it must be recognized that the Supreme Court has made a great effort to articulate what does and what does not constitute a valid claim of sexual harassment based on hostile work environment. The Second Circuit has closely followed the rules and definitions laid down by the Supreme Court. The court in the present case must do the same.

Was Fitzgerald's workplace at Ford Marrin permeated with discriminatory intimidation, ridicule and insult that was sufficiently severe or pervasive so as to alter the conditions of Fitzgerald's employment and create an abusive working environment? Using the equivalent phraseology employed in *Oncale,* was the conduct at Ford Marrin "severely hostile or abusive" toward Fitzgerald, creating a severely or pervasively abusive working environment? And were these things shown in light of all the surrounding circumstances?

As noted above, the Supreme Court has gone so far as to say that the conduct must be extreme in order to amount to a change in the terms and conditions of employment. The Court has said that the standard for judging hostility must be sufficiently demanding so as to prevent Title VII from becoming a general civility code. The Second Circuit has stated that there is a line between merely offensive or boorish conduct and actionable sexual harassment. Was the conduct at Ford Marrin extreme within the meaning of the Supreme Court? Was it such as to meet the demanding requirements of the Court for Title VII

hostile work environment liability, or was it merely offensive or boorish?

In examining the facts of the present case, it is necessary, of course, to look at all the incidents and types of conduct in question *as a whole* and also to view the working environment as a whole. But this cannot be done in any intelligible manner without first examining separately particular incidents and particular types of conduct.

■ The court starts with the sexual conversations and remarks by certain male associates among themselves (the court's first category). It was this conduct which, according to Fitzgerald's evidence, persisted throughout her entire time at Ford Marrin.

This conduct involved three associates, sometimes joined by one or two others, talking about sex, exchanging sexual jokes, and throwing off exclamations such as "fuck." All this occurred in the lunchroom and elsewhere under circumstances where Fitzgerald heard such talk two or three times a week. Fitzgerald's own witnesses asserted that the conversations were in a humorous vein; they were nonsensical. The conversations, including the jokes, were a way of relaxing. The exclamations were to some extent irritable, as when a machine malfunctioned. Fitzgerald's witnesses gave a full description of the nature of the talk and the language used, which is summarized earlier in this opinion. Without doubt, what these witnesses described was crude, boorish, and offensive to Fitzgerald, O'Neil and Scott. But the talk was not directed to Fitzgerald or her friends. Nor was it about any of them. It did not disparage them or contain anything insulting to them personally, nor was there any joking or bantering about anyone having sexual activity with Fitzgerald or her friends.

The court concludes that this joking and nonsensical sexual talk among certain male associates and the utterance of vulgar terms and epithets, while gross and offensive to a woman such as Fitzgerald, was not hostile or abusive, much less hostile or abusive to a severe or extreme degree. It did not impose upon Fitzgerald the severe or pervasive discriminatory intimidation, ridicule and insult spoken of by the Supreme Court. Misconceived, vulgar fun is something different from hostility and abuse if the meaning of words is to be attended to.

These conclusions are reinforced by examining the full picture of how the accused associates treated Fitzgerald and of her relationship with them. Fitzgerald described Tricarico as a "work friend," and this characterization applied to the entire time she was at Ford Marrin, which means all the time he was participating in the sexual talk. Fitzgerald's friendship with Tricarico was in fact close and constant, in the office and often socially outside the office, having nothing to do with sex or romance, but involving companionship, the sharing of confidences and the occasional exchange of favors and gifts.

Fitzgerald's friendship with Adrian was also close. Fitzgerald regularly sought Adrian's advice on questions pertaining to her cases. She asked him for help on personal matters of importance to her, and Adrian readily expended time and effort in responding. Fitzgerald and Adrian participated together in normal office social occasions after work.

Beke and Fitzgerald were friends at the office and sometimes socially until the incident described earlier, which occurred about midway through Fitzgerald's employment at Ford Marrin and had nothing to do with her claim of offensive sexual talk. However, later, when Fitzgerald was leaving the office, Beke was one of her

hosts at an expensive visit to a bar on Madison Avenue, to wish Fitzgerald well.

Nothing would be added by analyzing Fitzgerald's relationship to the one or two other male associates who joined in the sexual talk, except to say that it was a normal and friendly one.

Given the entire picture of Fitzgerald's treatment by Tricarico, Adrian, and Beke and the one or two others, there is no basis for saying that these associates were severely hostile or abusive to her or that they inflicted upon her a severely or pervasively abusive working environment. A working environment with the kind of manifestations of mutual goodwill that occurred here is surely not what the Supreme Court is talking about as an abusive environment.

■ The court now turns to what the court has described as the "second category"—conduct directed to Fitzgerald. This discussion properly starts with what presents the most difficult issue in the case—the instances when, according to Fitzgerald's evidence, Anania, as well as Adrian and other male associates, referred to her as dyke and butch.

Fitzgerald ascribes three incidents to Anania: (1) a meeting in April or May 1994 in Anania's office, attended by Ford, at which Anania said that a woman connected with the client was a "dyke, kind of like you, Ellen"; (2) an incident in June 1994 when Anania objected to Fitzgerald's pants suit and referred to Fitzgerald as a butch; and (3) an incident in September 1994 when Fitzgerald referred to herself as a butch, after which there was some give and take in the presence of Adrian—Anania denying that he had ever called Fitzgerald a butch and then ending up addressing her as butch.

The court is bound to say that it finds Fitzgerald's testimony on this subject questionable, particularly as to the meeting of April or May 1994. However, for purposes of the present motion the court will continue to assume that Fitzgerald's version of the facts is correct.

There is no way one can defend calling Fitzgerald a dyke or butch, assuming that this occurred. But the question remains as to whether the conduct of Anania and of Ford, assuming Ford permitted such conduct on the first occasion, was severely hostile or abusive and whether it created or contributed to an abusive work environment.

Fitzgerald is not a lesbian. There is no evidence suggesting that Anania or Ford or anyone else thought that Fitzgerald was a lesbian or was trying to give Fitzgerald the reputation of being a lesbian. However, Anania's dyke reference at the April/May meeting, if it was made, was one remark in a meeting which involved a review of a case Ford was taking over for Anania. There is no indication that the rest of the discussion was anything but professional and courteous. Also, the remark would never have gone outside Anania's office if Fitzgerald had not told others about it. She told not only O'Neil and Scott, but also Adrian, who was one of the three or so associates she considered to be engaging in offensive sexual talk in the office. As to the June remark, there is no indication that it was heard by anyone other than Fitzgerald.

But, according to the Supreme Court precepts, the issue of whether the conduct of Anania and Ford was abusive and created an abusive working environment can only be answered by an examination of the overall relationship of Fitzgerald with Anania and Ford during this period. Fitzgerald herself testified at the trial about how, in June 1994, Anania gave her an assignment which was "very exciting" and was "something you want to sink your teeth

into" and that "you look forward to." Anania asked her to prepare to examine three witnesses at a trial, which meant interviewing them and preparing a "Q and A" for each. Before interviewing one of the witnesses, who was a sheriff, Fitzgerald spoke to Ford. Fitzgerald's testimony in this regard conveyed the idea that she was receiving approbation from Anania and Ford, and had a comfortable working relationship with them. This testimony related to the period of time shortly after the April/May meeting and during the very month when the pants suit encounter occurred.

In August 1994 Fitzgerald brought back from her vacation certain information about golf at Martha's Vineyard, which she gave to Anania, and in September she and another associate in Anania's team took Anania to lunch to celebrate his 40th birthday.

Aside from the offensive reaction which Fitzgerald testified arose from Anania using the terms dyke and butch, there is no testimony from Fitzgerald and no other evidence that Anania's conduct caused Fitzgerald difficulty in working in his team. Such a thing is simply not addressed in her evidence. In addition, there is no evidence that Ford's observation of the dyke incident, if it occurred, altered in any way whatever working relationship Fitzgerald had with Ford. There is no evidence that the alleged pants suit incident even had the effect of deterring Fitzgerald from wearing pants suits. The uncontradicted evidence is that women associates at Ford Marrin wore pants suits when they chose.

Looking at all the circumstances, the overall conduct of Anania and Ford at the time of the dyke incident and the pants suit incident was on balance neither hostile nor abusive and it did not create or contribute to an abusive working environment.

In fact the uncontradicted evidence shows that the conduct of Anania and Ford, taken as a whole, was highly supportive of Fitzgerald at the time in question, creating what was in fact a beneficial working environment.

As to the occasions on which Adrian and possibly other associates referred to Fitzgerald as butch, the court notes several things. In the first place, the court does not discount in the slightest degree the offensiveness to Fitzgerald of such conduct. But according to Fitzgerald's own witness, O'Neil, the associates who were involved were teasing and joking around, although they were aware of Fitzgerald's discomfort. Moreover, Fitzgerald recalled being called butch no more than a half a dozen times or so, and Scott said that the problem lasted about two weeks. The conduct stopped after Scott relayed Fitzgerald's complaint.

The court believes that the kind of teasing and joking conduct in question here is what the Supreme Court has specifically excluded from being grounds for Title VII liability. Moreover, when all the circumstances are taken into account, the conduct of Adrian, joined by a few others, was not hostile or abusive toward Fitzgerald and did not, when the whole picture of the friendship between Adrian and Fitzgerald is considered, inflict upon Fitzgerald an abusive working environment.

As to the September incident with Anania, there is nothing to suggest that anyone would have referred to Fitzgerald as butch at this time if she had not led off by doing so. In any event, as earlier described, the overall conduct of Anania toward Fitzgerald and the working environment between them was professional and satisfactory, as Fitzgerald herself has described it. She described the status of their working relationship in June and

gave no indication of any deterioration by September.

Fitzgerald claims misconduct on Adrian's part because during the course of the September conversation he suggested that Fitzgerald wear something black and lacey to the wedding under discussion. This simply did not rise to the level of sexual harassment.

A few other claims of misconduct on the part of Adrian need to be dealt with.

The incident in early 1994 when Adrian asked Fitzgerald if she wished to lick his fingers, which was a reference to Kentucky Fried Chicken's slogan "finger lickin' good," was obviously a jest and was neither hostile nor abusive. There is no evidence of Adrian attempting to engage in sexual activity of any kind with Fitzgerald, or making any actual sexual advances toward her.

Adrian's comment that Fitzgerald and a paralegal must be going out slumming to pick up men was misplaced humor, but cannot be considered to meet the Supreme Court's definition of severely hostile or abusive.

With regard to the boxer short incident, the court is mindful of the need to accept Fitzgerald's version of the facts, but it is difficult to avoid noting Adrian's perfectly plausible testimony about a subject he undoubtedly knows most about—that he does not wear boxer shorts and was changing into athletic shorts. In any event the incident did not involve any actual indecent exposure, and cannot be said to have been severely hostile or abusive.

Fitzgerald testified that in June 1994, when she was wearing a sweater because of the over-cool office, she passed Adrian's office and he said that what she was wearing was not slutty enough. The court readily concludes that this was not severely hostile or abusive conduct and that, in the context of Fitzgerald's overall favorable relationship with Adrian, the incident did not create or contribute to an abusive working environment.

As to the e-mail incident, this occurred after both Fitzgerald and Adrian returned from their vacations around Labor Day of 1994. Adrian testified, and Fitzgerald did not deny, that she had brought a couple of maps back with her and asked Adrian to come to her office and advise her where they should be placed; that they discussed her vacation, and that he had asked her whom she was with. Adrian testified that Fitzgerald responded that she was with a male friend and that there was then some jesting about sex of a quite innocent nature. Fitzgerald's testimony does not say how she responded about whom she was with. But she denied any jesting about sex, something the court must accept. Adrian testified, and Fitzgerald did not deny, that the e-mail system among associates had not been working and that during his conversation with Fitzgerald, Scott came in and announced that they could now exchange e-mails, which they proceeded to do. Fitzgerald testified that Adrian sent Fitzgerald an e-mail saying, "If Nantucket boy isn't getting it done, I can take care of you." Adrian did not deny that something of this nature was sent, but said that it was a joking follow-up to the earlier conversation. This again is an example of, at most, crude humor. There is no indication that Adrian was propositioning Fitzgerald. He never did so. What Adrian did cannot be considered abusive. It should be noted that shortly after this incident Fitzgerald asked Adrian for his help in breaking a lease and obtaining the refund of a deposit, which Adrian readily agreed to do.

The "cat calls" or "wolf whistles" which are said to have been made by Adrian at Fitzgerald every other week or so would surely come under the heading of the kind

of flirtation which the Supreme Court has specifically excluded from what it deems sexual harassment.

Finally, there are two remaining claims about Anania.

Fitzgerald testified that at her performance evaluation in December 1994 Anania said that she should be more aggressive and be more like Adrian, who, if turned down by one woman at a bar goes on to the next. This was merely a metaphor about aggressive legal performance and not intentionally sexually suggestive.

After the Christmas party of partner Cushing O. Condon in December 1994, Anania, according to Fitzgerald, asked Fitzgerald if there had been any cock-twisting at the party, and repeated the question later in the presence of Esposito. Apparently Condon, aside from having the initials "COC" was also an excellent dancer. Thus, there was the double entendre, one meaning having a sexual connotation. It falls clearly within the realm of the offensive and boorish, but not the severely hostile or abusive. In any event, by this time Fitzgerald was negotiating with another firm to move there from Ford Marrin despite the fact that Ford had decided to attempt to assist Fitzgerald in her performance difficulties by having her assigned to him.

The conclusions of the court set forth thus far in this opinion are based on Fitzgerald's version of the facts, supplemented in some instances by uncontradicted evidence from Ford Marrin, and are made as a matter of law, applying the definitions contained in the Supreme Court decisions.

Now that the various elements of Fitzgerald's claim have been analyzed individually, it is necessary to deal with the issue of whether, taken as a whole, these elements add up to a basis of liability under Title VII. Sometimes the whole is greater than the sum of the parts. There is an issue about whether that is true here.

The sexual talk among male associates (the court's "first category"), overheard by Fitzgerald, was offensive to her, and for good reason, as the factual description in this opinion makes abundantly clear. The remarks and actions directed to Fitzgerald (the "second category") were in some cases innocuous, but in other cases deeply offensive, as in calling her dyke and butch.

But the underlying characteristic of the conversations, remarks and acts complained of, taken as a whole, is that they were in a humorous vein, joking, teasing, relaxation from the rigors of demanding legal work. Even the references to Fitzgerald as dyke and butch were something other than serious attempts to paint Fitzgerald as a lesbian. The same is surely true of her own remark that she was a butch. Even O'Neil testified that in this connection Adrian and other associates were teasing and joking, albeit in a way that made Fitzgerald most uncomfortable.

It should also be added that the instances of offensive talk and behavior took place in the context of an overall considerate, professional treatment of Fitzgerald, and relationships within the firm of the utmost friendliness. It is uncontradicted that, throughout her tenure at Ford Marrin, Anania and the other partners Fitzgerald worked for gave her assignments and directed, assisted and reviewed her work in an entirely proper and professional manner. All of this is highly relevant in judging whether there was severely hostile or abusive treatment of Fitzgerald and whether there was an abusive working environment. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81–82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

When all the relevant circumstances are taken into account, there is no basis for finding that the accused persons at Ford

Marrin treated Fitzgerald in a hostile or abusive manner, and certainly not in a way that could be termed severely or extremely hostile or abusive. There is no basis for finding that Fitzgerald's workplace at Ford Marrin was permeated with discriminatory intimidation, ridicule and insult that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment. The overall picture of the working environment was in fact virtually the opposite of an abusive one. The court draws these conclusions as a matter of law based on Fitzgerald's version of the facts and certain uncontradicted defense evidence. Any other conclusions would require the court to ignore or rewrite the carefully articulated definitions given by the Supreme Court. Obviously this court will not do the former and has no power to do the latter.

Fitzgerald testified that she experienced headaches, loss of sleep, and diminished morale and ability to concentrate as a result of the sexual talk and actions. The court accepts this as true. However, there is no evidence that Fitzgerald mentioned these problems to anyone at the firm, at least not to someone in a management capacity. Thus the problems were entirely subjective and personal. As the court explained earlier, Fitzgerald must make out a case under both an objective and a subjective standard. The court has concluded that, under an objective standard, there was no hostile work environment. The evidence about what Fitzgerald experienced of a subjective and personal nature does not detract from the conclusion which the court has reached.

The court must also make an observation about how the partners viewed the quality of Fitzgerald's work. The court has noted Fitzgerald's testimony about Anania and Ford displaying a favorable view of her work in the summer of 1994.

Indeed it is uncontradicted that the partners gave her ample opportunities to show the degree of her industry and talent, even though ultimately the judgment on the quality of her work was negative when her performance was reviewed in December 1994.

Before concluding this opinion, some further comments about the case law need to be made. As described earlier in this opinion, after the regular briefing on the present motion had been completed, the court requested the parties to submit summaries of additional cases they thought would be helpful to the court *on their facts*. Fitzgerald provided summaries of 52 cases and Ford Marrin 59. These cases, together with those referred to in the regular briefs, while only a part of the great body of case law on the subject at hand, surely supplied ample information about how the courts have approached the hostile work environment issue in sex discrimination cases.

Fitzgerald, of course, has directed the attention of the court to decisions upholding hostile work environment claims. However, Fitzgerald has cited no case factually similar to the present case.

In the cases cited by Fitzgerald the plaintiff was frequently called a "whore" or other names of the vilest kind meaning the same thing. In some cases it was suggested in vile terms that the plaintiff should perform oral sex with a supervisor or co-workers or customers. Some of the plaintiffs were subjected to graffiti, pictures or cartoons of the most extreme obscene nature, dealing with male and female bodily parts and perverted sexual acts of all kinds. Probing into the plaintiff's sex life was a feature in certain cases. Some of the cases involved unwanted, and sometimes threatening, touching and handling of a sexual nature. There are cases in which rumors were spread about illicit sex by the plaintiff. In some cases slurs were

directed to the plaintiff, not of a sexual nature in an erotic sense, but disparaging her capacity to do her job because of her sex. Different cases had different combinations of the types of conduct. In some of the cases the conduct was directed to the plaintiff and in others against the women employees including plaintiff. *See, e.g., Howley v. Town of Stratford*, 217 F.3d 141 (2d Cir.2000); *Cruz v. Coach Stores, Inc.*, 202 F.3d 560 (2d Cir.2000); *Leopold v. Baccarat*, 174 F.3d 261 (2d Cir.1999); *Danna v. New York Tel. Co.*, 752 F.Supp. 594 (S.D.N.Y.1990); *Dyke v. McCleave*, 79 F.Supp.2d 98 (N.D.N.Y.2000); *Alfano v. Costello*, 940 F.Supp. 459 (N.D.N.Y.1996); *EEOC v. A. Sam & Sons Produce Co.*, 872 F.Supp. 29 (W.D.N.Y.1994); *Farpella–Crosby v. Horizon Health Care*, 97 F.3d 803 (5th Cir.1996); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459 (9th Cir.1994); *Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996 (10th Cir.1996).

In one case cited by Fitzgerald, the district court denied a motion for summary judgment where the plaintiff claimed a hostile work environment on the basis of "dirty jokes." *Poff v. Oak Tree Mortgage Corp.*, 61 Fair Employ. Prac. Cas. (BNA) 1562 (E.D.La.1993). However, the court did not purport to undertake a thorough analysis of the law. Moreover, the female plaintiff was forced under protest to listen to the jokes told by the company president, and in one joke the president substituted the names of the plaintiff and a male employee, thus ridiculing the plaintiff's breasts and apparently posing a mock sexual relationship between the plaintiff and the other employee.

Two cases cited by Fitzgerald are of a different nature from what has been discussed above. In *Gallagher v. Delaney*, 139 F.3d 338 (2d Cir.1998), the Second Circuit reversed a grant of summary judgment in a case where the plaintiff alleged that her supervisor was imposing his at-tentions upon her by directing her to accompany him on certain social occasions, by asking her personal questions and by telling her that she brought out adolescent feelings in him, all in the course of reminding the plaintiff that he was her boss and that she should keep him happy. The plaintiff claimed that his behavior implicitly constituted a request for sexual relations. The court held that there was a sufficient basis for having a jury decide the dual claim in the case of *quid pro quo* harassment and hostile work environment harassment. In *Ellison v. Brady*, 924 F.2d 872 (9th Cir.1991), the Ninth Circuit reversed a grant of summary judgment on the ground that a co-worker's communications to the plaintiff, suggesting a relationship that did not exist, could cause the plaintiff to be concerned for her safety.

To summarize, the cases cited by Fitzgerald involving sexual talk, or other talk disparaging of women, were cases where the conduct was literally hostile and abusive to a severe degree. *Gallagher* and *Ellison* dealt with attempts to develop unwanted sexual relationships. None of Fitzgerald's cases offers a precedent for finding liability in the present case.

Ford Marrin has cited cases in which hostile environment claims have been denied as a matter of law. Certain of these are of interest because they are examples of courts responding to the warning of the Supreme Court that Title VII should not be used as a civility code. *Black v. Zaring Homes, Inc.*, 104 F.3d 822 (6th Cir.1997); *Baskerville v. Culligan International Co.*, 50 F.3d 428 (7th Cir.1995); *Shepherd v. Comptroller of Public Accounts of State of Texas*, 168 F.3d 871 (5th Cir.1999). However, on their facts, these cases deal only with claims that are analogous to what this court has described as falling in the "second category." None of the cases cited by Ford Marrin deal with a situation where there was a running exchange of conversa-

tion among co-workers about sex, a relating of sexual jokes, and the use of certain vulgar terms, none of which was directed at the plaintiff but was overheard by her. This is what the court in the present case has described under the heading of the "first category." It is this latter feature of the case at hand which finds no real analogue in any decision to which the court's attention has been called. Indeed, this court knows of no decision where the facts of the present case, taken as a whole, have been the subject of a judicial ruling under Title VII. However, for the reasons explained earlier, the court concludes that the definitions articulated by the Supreme Court preclude liability in the present case.

### Conclusion

The court grants Ford Marrin's motion for judgment as a matter of law setting aside the jury verdict finding a hostile work environment. This means that the action is dismissed.

Settle judgment.

SO ORDERED.