**Rodney WRIGHT, Plaintiff,**

v.

**GOLDMAN SACHS & COMPANY, et al. Defendants.**

**No. 1:00–CV–6889 GBD FM.**

United States District Court, S.D. New York.

Jan. 26, 2005.

Desiree S. Hamilton, Brooklyn, NY, for Plaintiff.

Aaron Schindel, Karen Stefflre, Esq., Proskauer Rose LLP, New York, NY, for Defendants.

### ORDER

DANIELS, District Judge.

This action was referred to Magistrate Judge Frank Maas for a Report and Recommendation ("Report") on defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. Magistrate Judge Maas issued a Report wherein he recommended that defendants' motion for summary judgment be granted. In his Report, Magistrate Judge Maas advised the parties that failure to file timely objections to the Report will constitute a waiver of those objections. Although plaintiff twice requested and was granted an extension of time to file objections to the Report, none of the parties have filed objections and the time to do so has expired. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b).

Where there are no objections, the Court may accept the Report provided there is no clear error on the face of the record. *See Nelson v. Smith,* 618 F.Supp. 1186, 1189 (S.D.N.Y.1985); *Heisler v. Kralik,* 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd* 164 F.3d 618, 1998 WL 636985 (2d Cir.1998). After reviewing the Report, the Court finds that the record is not facially erroneous. Accordingly, the Court adopts the Report in its entirety and for the reasons stated therein, the motion is hereby granted and the complaint is dismissed.

SO ORDERED.

### REPORT AND RECOMMENDATION TO THE HONORABLE GEORGE B. DANIELS

MAAS, United States Magistrate Judge.

#### I. *Introduction*

This is an employment discrimination action brought by plaintiff Rodney Wright ("Wright") pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.,* and 42 U.S.C. §§ 1981 and 1983. The defendants are Wright's former employer, Goldman, Sachs & Company, and several of its employees, Cathy Bernardo, Joseph Newman, Peggy Chow and Gerhard Doetsch. In his Amended Complaint, Wright alleges that, on the basis of his race, he was subjected to disparate treatment, denied a promotion, and ultimately constructively discharged. (Am.Compl.¶ 5).

The Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, I recommend that the Defendants' motion be granted and this case dismissed.

#### II. *Procedural History*

On April 4, 2000, Wright filed a charge of discrimination with the Equal Employ-

ment Opportunity Commission ("EEOC"). In his complaint, Wright alleged that Goldman treated him less favorably than his Asian co-workers, and that he was "constructively terminated" on March 23, 2000. (*See* Aff. of Karen Stefflre, Esq., dated July 30, 2001 ("Stefflre Aff."), Ex. H). After the EEOC was unable to substantiate these claims, it issued Wright a right-to-sue letter on June 28, 2000. (*Id.* Ex. I). This lawsuit thereafter was timely commenced on September 13, 2000. (*See* Docket No. 1).

Wright's original complaint was filed *pro se.* Subsequently, however, Wright retained Desiree Hamilton as his attorney, and she filed an amended complaint on November 27, 2000. (Docket No. 8). The amended complaint incorporates all three claims that Wright advanced before the EEOC. (*See* Stefflre Aff. Ex. A (Am. Compl.) ¶ 5 ("The discriminatory conduct of which plaintiff complains in this action includes [u]nequal terms, treatment and conditions of employment, constructive termination of his employment, and failure to promote him.")).

Following the completion of pretrial discovery, Goldman filed its motion for summary judgment on July 31, 2001. (Docket No. 15). Wright filed his memorandum of law in opposition to the motion on October 19, 2001.[1] (Docket No. 18). Thereafter, on March 16, 2004, Your Honor referred the motion to me for a Report and Recommendation. (Docket No. 20).

III. *Facts*

■ Although Goldman submitted a Rule 56.1 statement of undisputed facts as part of its motion papers, Wright did not submit a separate counterstatement of dis-

puted facts as the Local Civil Rule requires. Moreover, contrary to the Rule, much of the discussion of facts in Wright's memorandum of law opposing summary judgment is bereft of citations to admissible evidence, and many of the citations which are given refer to documents that do not support Wright's factual assertions. For these reasons, the facts set forth in Goldman's Rule 56.1 statement must be deemed admitted. *See* Local Civ. R. 56.1(c) ("Each numbered paragraph in the statement of material facts required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *Loucar v. Boston Market Corp.,* 294 F.Supp.2d 472, 478 (S.D.N.Y.2003) (plaintiff's "unsupported, conclusory assertions and denials" cannot refute defendant's "properly-supported statements of material fact in its Rule 56.1 Statement"); *Gadsden v. Jones Lang Lasalle Americas, Inc.,* 210 F.Supp.2d 430, 438 (S.D.N.Y.2002) ("Courts in this circuit have not hesitated to deem admitted the facts in a movant's Local Civil Rule 56.1 Statement that have not been controverted by a Local Civil Rule 56.1 statement from the nonmoving party.").

Viewed in the light most favorable to Wright, the undisputed facts are as follows:

A. *Wright's Employment and Supervisors*

Wright is an African–American male who was employed by AccountPros, an employment agency that places individuals in temporary positions. (Defs.' R. 56.1

---

1. Wright's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Mem.") is not paginated. Accordingly, the citations in this Report and Recommendation refer to the page numbers that should have appeared in the memorandum.

Stmt. ¶ 1; Stefflre Aff. Ex. B (Dep. of Rodney Wright, taken on Feb. 21, 2001 ("Wright Dep.")), at 24, 39). On September 5, 1999, Wright was given a temporary assignment as a "processor" in the Travel and Expense ("T & E") unit of Goldman, Sachs & Company ("Goldman").[2] (Defs.' R. 56.1 Stmt. ¶ 2; Wright Dep. at 39, 52). The T & E unit is a part of Goldman's accounting services department responsible for processing travel and entertainment expenses. (Defs.' R. 56.1 Stmt. ¶ 4; Stefflre Aff. Ex. C (Dep. of Gerhard Doetsch, taken on Mar. 1, 2001 ("Doetsch Dep.")), at 5).

During the time that Wright was assigned to the T & E unit, he and three Asian males—Auyoung Heng ("Heng"), Raymond Chan ("Chan") and Alan Lo ("Lo")—worked as "processors," inserting into T & E reports data that had previously been coded by "prepper[s]." (Defs.' R. 56.1 Stmt. ¶¶ 5–6; Wright Dep. at 52–53). Wright remained in the T & E unit as a processor until March 23, 2000, when he resigned his position. (Defs.' R. 56.1 Stmt. ¶ 3; Wright Dep. at 99, 127).

Throughout the time that Wright worked at Goldman, Gerhard Doetsch ("Doetsch") was a Goldman vice president and manager of its accounting services department. (Defs.' R. 56.1 Stmt. ¶ 7; Doetsch Dep. at 4–5). Holly Brown ("Brown"), an African–American female,

was the manager of accounts payable and T & E processing, reporting to Doetsch until November 1999, when she was succeeded by Joseph Newman ("Newman"). (Defs.' R. 56.1 Stmt. ¶ 8; Stefflre Aff. Ex. D (Dep. of Joseph Newman, taken on Mar. 6, 2001 ("Newman Dep.")) at 4, 25). Katherine Bernardo ("Bernardo"), an Asian female, was the T & E unit supervisor, reporting to Brown and then Newman until December 15, 1999, when she was replaced by Janet Lee ("Lee"), also an Asian female. (Defs.' R. 56.1 Stmt. ¶¶ 9–10; Stefflre Aff. Ex. E (Dep. of Katherine Bernardo, taken on Mar. 1, 2001 ("Bernardo Dep.")) at 5–6, 8; Newman Dep. at 56; Wright Dep. at 104, 118).[3] Bernardo, and then Lee, served as Wright's immediate supervisor, in which capacity they assigned work to him and the other processors. (Defs.' R. 56.1 Stmt. ¶ 11; Bernardo Dep. at 6, 11–12). Once the T & E reports were completed by the processors, Peggy Chow ("Chow"), an Asian female assigned to the Quality Control unit in the accounting department, was responsible for checking their accuracy. (Defs.' R. 56.1 Stmt. ¶¶ 12–13; Stefflre Aff. Ex. F (Dep. of Yuk Fong Peggy Chow, taken on Feb. 26, 2001 ("Chow Dep.")) at 6).

### B. *Wright's Claims of Discrimination*

Wright's claims arise out of several incidents that allegedly occurred during his

---

2. Although Wright evidently was assigned to Goldman by AccountPros, Goldman has not suggested that he was not a Goldman employee. I therefore have assumed for purposes of this Report and Recommendation that Goldman was Wright's employer. *See generally Adams v. Debevoise & Plimpton*, No. 03 Civ. 3015(AKH), 2004 WL 1737826, at *2 (S.D.N.Y. Aug.3, 2004) (concluding that the defendant law firm was a joint employer of the plaintiff legal secretary given its "continued, long-term relationship with [plaintiff], and its control of the conditions of employment there").

3. In his papers, Wright contends that "[t]here is a[n] issue about when Ms. Bernardo ceased to be[ ] Mr. Wright's supervisor .... Mr. Wright and his coworkers state that Ms. Bernardo was still [Wright's] supervisor until the day [he] resigned [March 23, 2000]." (Pl.'s Mem. at 2) (citing Wright Dep. at 60–61, 1170; Dep. of Nelson Dumana, taken on Mar. 30, 2001 ("Dumana Dep.") at 11–12.) Nothing in the deposition excerpts cited by Wright supports this assertion, however.

employment at Goldman. Those incidents, and the admissible evidence with respect to them, may be summarized as follows:

### 1. Denial of Early Release

On one occasion in October or November 1999, Wright informed Bernardo that he could not stay late because he was suffering from an ear infection. (Defs.' R. 56.1 Stmt. ¶ 14; Wright Dep. at 83–84). In response, Bernardo told him that everyone in the T & E unit was required to remain, and she did not allow him to leave work early. (Defs.' R. 56.1 Stmt. ¶ 15; Wright Dep. at 84). Approximately fifteen minutes later, Bernardo herself left work and Wright repeated his request to Brown, who eventually allowed him to leave. (Defs.' R. 56.1 Stmt. ¶¶ 16–17; Wright Dep. at 84). Wright contends that Bernardo's response to his request was discriminatory because she permitted Heng to leave work early the very next day when he had a stomach ache. (Defs.' R. 56.1 Stmt. ¶ 19; Wright Dep. at 84–85).

### 2. Denial of Overtime

Notwithstanding her response when Wright wished to leave early, on at least two other occasions, Bernardo escorted Wright to the elevator at the end of a workday to prevent him from working overtime. (Defendants' Rule 56.1 Stmt. ¶ 24; Pl.'s Mem. at 3; Wright Dep. at 85–87). Wright contends that this constituted discriminatory conduct because Bernardo permitted Chan, Heng, and Chow to remain at work. (Wright Dep. at 87). On at least one of those occasions, however, Ian

Alli, a black male from Guyana, also was allowed to work overtime.[4] (Bernardo Dep. at 8–9; Stefflre Aff. Ex. G) (Dumana Dep. at 22).

### 3. Work Assignments

Wright also contends that Bernardo intentionally assigned him more voluminous reports than she assigned to his coworkers, while allowing his coworkers more time to complete their tasks. (See Am. Comp. ¶ 12). At his deposition, however, Wright admitted that he did not know how many reports his Asian coworkers had produced or how many lines of data were processed by them. (Wright Dep. at 62, 64–66). Similarly, although Wright stated during his deposition that he was the only processor who could input "taxi" reports, he later admitted that Heng also did so, and that he did not know whether Lo had processed taxi expense data. (Id. at 75).

### 4. Missing Reports

Wright contends that on five separate occasions Bernardo removed a total of approximately ten completed reports from his desk. (Defs.' R. 56.1 Stmt. ¶ 26; Pl.'s Mem. at 2; Wright Dep. at 89–90). He was, however, unable to say whether Bernardo had removed such reports from the desks of other T & E unit employees. (Defs.' R. 56.1 Stmt. ¶ 27; Wright Dep. at 89). Wright testified that the removal of these reports reflected negatively on his performance because his reported production would appear to be overstated. (Wright Dep. at 89). Although the missing reports ultimately were found, and Wright

---

**4.** Wright seeks to impeach the uncontradicted testimony concerning Alli's race through the deposition testimony of Julia Russell, a coworker who stated that she was unsure of Alli's ethnicity, but noted that he was Guyanese. (Dep. of Julia Russell, taken on Mar. 14, 2001 ("Russell Dep."), at 15–16, 20). Russell's uncertainty, however, is insufficient to cast doubt on Bernardo's unequivocal testimony that Alli is Black. (See Bernardo Dep. at 8–9). (Indeed, according to the CIA World Factbook, the population of Guyana is 50 percent East Indian and 36 percent Black.) (See CIA World Factbook 2004, available at http://www.cia.gov/cia/publications/factbook/geos/gy.html# Peop le ).

received credit for them, (Defs.' R. 56.1 Stmt. ¶ 28; Wright Dep. at 89–90), he contends that the time he was forced to spend looking for them further reduced his productivity. (Wright Dep. at 90).

### 5. *Deleted Reports*

Wright further alleges that, without his consent, Bernardo asked Chow to delete certain reports that Wright had entered into the computer system. (Pl.'s Mem. at 3). Wright contends that there was no reason for Chow to delete entire reports because any errors that they contained could have been corrected by the Quality Control unit. (Wright Dep. at 93). Wright also contends that only his reports were deleted, (Am. Compl. ¶ 16; Wright Dep. at 96), and that these deletions were discriminatory (Defs.' R. 56.1 Stmt. ¶ 37; Wright Dep. at 96). Wright testified that after the deletion of one report, he complained to Newman, who confirmed that there was no reason for Chow to have deleted Wright's reports. (Wright Dep. at 94).

Although Chow apparently did not delete entire reports of other T & E unit employees, part of her quality control job was to correct the information on processed reports. (Chow Dep. at 6). As part of this function, between September 1999 and March 2000, Chow deleted specific entries from reports processed by Heng and Lo, but not entire reports that they had prepared. (Defs.' R. 56.1 Stmt. ¶ 39; Chow Dep. at 6, 9).

### 6. *Internet Usage*

In mid-March 2000, Newman told Wright that he had received complaints from three senior people in the T & E unit about Wright's Internet usage. (Defs.' R. 56.1 Stmt. ¶ 32; Wright Dep. at 90–91).

Wright used the Internet while at work to listen to music. (*Id.*). After this conversation, Wright observed Heng, Lo and Chan using the Internet. (Defs.' R. 56.1 Stmt. ¶ 33; Wright Dep. at 77). Nevertheless, in the two weeks before he resigned, Wright stopped using the Internet to listen to music. (Defs.' R. 56.1 Stmt. ¶ 34; Wright Dep. at 90–91).

In late 1999, the T & E unit converted to a new computer system, called OTIS, which often crashed. (Defs.' R. 56.1 Stmt. ¶ 29; Newman Dep. at 46–47; Wright Dep. at 55–56; Dumana Dep. at 18). There was a different Internet-based system which Wright understood could be used to process reports in such circumstances. Heng and Lo were permitted to use the Internet to complete their work assignments when OTIS failed, but Wright was not. (Defs.' R. 56.1 Stmt. ¶¶ 30–31; Wright Dep. at 56–58).

### 7. *Failure to Transfer*

Wright further alleges that he complained to Newman and Doetsch about Bernardo's behavior and requested a transfer out of the T & E unit. (Pl.'s Mem. at 5). Although Wright told both men, in substance, that Bernardo was biased against him, and told Newman that the situation was "becoming unbearable," he never suggested that Bernardo had discriminated against him on the basis of his race. (Defs. R. 56.1 Stmt. ¶ 53; Wright Dep. at 104–14, 116–18). Doetsch denied Wright's request for a transfer because he thought it would be too difficult to find a replacement for Wright in the T & E unit.[5] (Wright Dep. at 81).

Notwithstanding the alleged intransigence of these two supervisors, in Decem-

---

**5.** The parties differ as to the number of times that Doetsch met with Wright. Wright testified that he approached Doetsch on one occasion to request a transfer. (Wright Dep. at 81). Doetsch recalled no such meeting. (Doetsch Dep. at 13).

ber 1999 or January 2000, Brown asked Wright if he was interested in a transfer to "Syndicate Services" to fill an open position. (Wright Dep. at 80–82). Wright alleges that this, too, constituted an act of discrimination because he was overqualified for the position. (*Id.* at 82; Defs.' Rule 56.1. Stmt. ¶¶ 49–50). As of the time that Wright tendered his resignation, the Syndicate Services position remained unfilled. (Wright Dep. at 82).

### 8. *Failure to Transfer*

In February 2000, Wright send an e-mail to Newman requesting five days of unpaid leave in April. (Wright Dep. at 96). Thereafter, in March, Newman informed Wright that his production was not satisfactory and that "it was not working." (*Id.* at 98). Newman offered to review Wright's situation after a "wait and see" period, but Wright decided that "it would be in [his] best interest if [he] resigned [his] assignment [rather] than having been terminated." (*Id.* at 99). Accordingly, Wright handed in his ID card and left Goldman's employ. (*Id.*). For that reason, Newman never reached a final decision concerning Wright's leave request. (*Id.* at 100).

## III. *Discussion*

### A. *Summary Judgment Standard*

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,*

477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the court concludes that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial,'" and summary judgment must be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

In deciding a motion for summary judgment, the court must "view the evidence in the light most favorable to the party against whom summary judgment is sought and ... draw all permissible inferences in favor of that party." *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997). The Court must accept as true the nonmoving party's evidence, if supported by affidavits or other evidentiary material. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (noting that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]"). Thus, "[t]he court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried." *Fischl,* 128 F.3d at 55. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Accordingly, "[i]f the evidence is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citing *Dombrowski v. Eastland,* 387 U.S. 82, 87, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967); *Cities Serv. Co.,* 391 U.S. at 290, 88 S.Ct. 1575). *See also Niagara Mohawk Power Corp. v. Jones Chem., Inc.,* 315 F.3d

171, 175 (2d Cir.2003) (the "'mere existence of a scintilla of evidence' . . . is . . . insufficient to defeat summary judgment") (quoting *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505).

■ The Second Circuit has cautioned that summary judgment is often inappropriate in cases where the trier of fact will have to delve into an employer's intent, because intent is an issue as to which direct evidence is rarely available. *See, e.g., Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994); *Patrick v. LeFevre,* 745 F.2d 153, 159 (2d Cir.1984). However, when an employer has explained its conduct and the plaintiff has offered only conclusory assertions in opposition, summary judgment may be granted. *See Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all [discrimination] cases."). Thus, the "salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." *Id.*

### B. *Title VII*

#### 1. *Failure to Promote*

■ Wright's Amended Complaint alleges that one of the ways in which the Defendants discriminated against him was their failure to promote him. (Am. Compl.¶ 5) In order to make out a *prima facie* case of discrimination on this ground, a plaintiff must establish that (a) he is a member of a protected class, (b) he was qualified for a job for which he applied, (c) he was denied the job, and (d) "the denial occurred under circumstances giving rise to an inference of discrimination on a basis forbidden by Title VII." *Howley v. Town*

*of Stratford,* 217 F.3d 141, 150 (2d Cir. 2000). In his deposition testimony, however, Wright admitted that he was never denied a promotion. (Wright Dep. at 79–80). Consequently, Wright is unable to satisfy the third element of a *prima facie* failure-to-promote claim.

■ At his deposition, Wright contended that the failure-to-promote claim set forth in his Amended Complaint was really a failure-to-transfer claim. (*Id.* at 80). The latter claim is not asserted in Wright's Amended Complaint or his EEOC charge. (*See* Stefflre Aff. Exs. A, H). In any event, to establish a claim based on a failure to transfer, a plaintiff must show that he (a) applied for a position for which his employer was seeking applicants, and (b) was denied that position under circumstances which support an inference of discrimination. *See Gomez v. Pellicone,* 986 F.Supp. 220, 228 (S.D.N.Y. 1997). Wright has not introduced any evidence that he actually applied for a specific position within Goldman, stating at his deposition only that he requested a transfer to "any other department." (Wright Dep. at 81–82, 110). As the Second Circuit recently has noted in the context of a failure to promote claim, a specific application is required to "'ensure[ ] that, at the very least, the plaintiff employee alleges a particular adverse employment action.'" *Petrosino v. Bell Atlantic,* Nos. 03–766, 03–7708, 2004 WL 2177044, at *14 (2d Cir. Sept.29, 2004) (quoting *Brown v. Coach Stores, Inc.,* 163 F.3d 706, 710 (2d Cir. 1998)). This requirement ensures that "the fact finder is not left to speculate as to the qualifications of the competing candidates, the damages to be derived from the salary of unknown jobs, the availability of alternative positions, the plaintiff's willingness to serve in them . . ., etc." *Id.*

■ Additionally, although Wright and Brown discussed the possibility of his transferring to the Syndicate Services department, it is undisputed that Goldman had not named somebody to fill the vacancy there by the time that Wright left Goldman's employ. (*Id.* at 82). There consequently is no basis to conclude that Wright was denied that position. Finally, even if Wright were able to show that he was denied a transfer to Syndicate Services, there is no evidence that Goldman's failure to effect the transfer—which apparently had been suggested by a Black supervisor—was attributable to racial discrimination.[6]

Accordingly, the Defendants are entitled to summary judgment dismissing Wright's failure-to-promote (or failure-to-transfer) claim.

### 2. *Constructive Discharge*

Wright next contends that the "intolerable" working conditions at Goldman led to his constructive discharge. (*See* Am. Compl. ¶ 24; Pl.'s Mem. at 6). In that regard, Title VII provides that it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

Under the familiar burden-shifting analysis applicable to Title VII claims, a plaintiff must first establish a *prima facie* case by showing that he (a) was a member of a protected class; (b) his job performance was satisfactory; (c) he suffered an adverse employment action; and (d) the adverse employment action occurred under circumstances that give rise to an inference of discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 98 (2d Cir.2001); *Stern v. Trustees of Columbia Univ. in City of New York,* 131 F.3d 305, 311–12 (2d Cir.1997). As many courts have noted, this is not a difficult threshold to meet. *See, e.g., Kerzer v. Kingly Mfg.,* 156 F.3d 396, 401 (2d Cir. 1998) (describing the burden as "de minimis"). If the plaintiff succeeds in making this showing, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. Should the defendant carry that burden of production, the plaintiff then must prove that the legitimate reasons offered by the defendant are not true, but, rather, a pretext for discrimination. *See id.* at 804, 93 S.Ct. 1817.

■ There is no dispute that Wright is an African American and, therefore, is a member of a protected class. Although Goldman contends that Wright was not

---

**6.** The Defendants' memorandum of law states that Wright's counsel informally indicated to defense counsel after the close of discovery that Wright was also alleging sex discrimination in this case. (*See* Defs.' Mem. at 1–2). Wright's papers in opposition to the summary judgment motion do not contain so much as a syllable regarding that claim. In any event, Wright did not allege sex discrimination in his EEOC charge and such a claim is not reasonably related to his race discrimination claim. The Court therefore cannot entertain any sex discrimination claim in this lawsuit. *See, e.g.,*

*Gill v. City of New York,* 02 Civ. 10201(RWS), 2004 WL 816449, at *8 (S.D.N.Y. Apr. 16, 2004) (refusing to consider an equal protection claim asserted for the first time in plaintiff's papers in opposition to summary judgment); *Coleman v. Bd. of Educ.,* No. 96 Civ. 4293(GBD), 2002 WL 63555, at *3 (S.D.N.Y. Jan 16, 2002) (granting summary judgment for defendants on plaintiff's gender discrimination claim because her EEOC charge alleged discrimination based on national origin and the two claims were "not reasonably related").

qualified for his position as a processor because Newman had determined that he was not producing and had placed him on probation, (*see* Defs.' Mem. at 20; Wright Dep. at 97–98), it is undisputed that Goldman had hired Wright and availed itself of his services for many months. Moreover, notwithstanding Wright's troubled relations with Bernardo, there is no indication that Goldman had expressed any dissatisfaction with Wright's performance until shortly before he resigned. In these circumstances, the Defendants cannot show that Wright was not qualified to work as a processor in Goldman's T & E unit. Wright therefore has satisfied the first two elements of his *prima facie* constructive discharge claim.

■■■■ Where Wright's *prima facie* case falters is with respect to the requirement that he have suffered an adverse employment action. A plaintiff alleging that he was wrongfully terminated may satisfy this element by showing that he was either actually or constructively discharged. *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir.1996). Having resigned from his job, Wright, of course, can only claim that he was constructively discharged. Such a constructive discharge occurs "when the employer, rather than acting directly, *deliberately* makes an employee's working conditions so *intolerable* that the employee is *forced* into an involuntary resignation." *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir.1983) (internal quotation marks omitted; emphasis added); *accord Terry v. Ashcroft*, 336 F.3d 128, 151–52 (2d Cir. 2003). In order to meet this threshold, "the trier of fact must be satisfied that the ... working conditions [were] so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Pena*, 702 F.2d at 325 (internal quotation marks omitted); *Petro-*

*sino*, 385 F.3d 210, 229–30; *see Pennsylvania State Police v. Suders*, 542 U.S. 129, 124 S.Ct. 2342, 2354, 159 L.Ed.2d 204 (2004) (a plaintiff advancing a "hostile-environment constructive discharge claim" "must show working conditions so intolerable that a reasonable person would have felt compelled to resign").

■■■■ The constructive discharge standard is not met if the employee's working conditions were simply difficult or unpleasant. *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir.1993). As Judge McMahon has noted:

> "the only thing an employer must do to defeat a claim of constructive discharge is provide a working environment that is not 'intolerable.' This, as the Second Circuit has held repeatedly, is a very low threshold. Put conversely, a working environment can be far from perfect and yet will not be held to be intolerable."

*Cooper v. Wyeth Ayerst Lederle*, 106 F.Supp.2d 479, 497 (S.D.N.Y.2000) (quoting *Pena*, 702 F.2d at 325).

■■■■ Moreover, to prevail on a constructive discharge claim, a plaintiff must show that the employer engaged in deliberate action. *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 74 (2d Cir. 2000). "While the meaning of 'deliberate' in this context is unsettled, [the Second Circuit] case law indicates that something beyond mere negligence or ineffectiveness" on the part of the employer is required. *Id.* (citations omitted).

Because it is so difficult to establish that an employee was constructively discharged, claims such as those asserted by Wright are routinely rejected by the courts. *See, e.g., Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156–57 (2d Cir.1993) (affirming the trial court's dismissal of constructive discharge claim despite plaintiff's

allegation that he had been placed on probation); *Martin v. Citibank, N.A.,* 762 F.2d 212, 221 (2d Cir.1985) (no constructive discharge where a bank teller was given the wrong combination to the night deposit safe on one occasion, and, on another occasion, was unable to input her deposits); *Punsal v. Mount Sinai Servs. of the Mount Sinai School of Med.,* No. 01 Civ. 5410(CBM), 2004 WL 736892, at *8 (S.D.N.Y. Apr.6, 2004) (while the removal of books and policy manuals from plaintiff's office was "inconvenient and possibly disruptive," such a "minor, ministerial stumbling block without a sufficiently deleterious effect ... is not an 'adverse employment action'"); *Woodcock v. Montefiore Med. Ctr.,* No. 98–CV4420 (ILG), 2002 WL 403601, at *7 (E.D.N.Y. Jan 28, 2002) (finding no constructive discharge where plaintiff's allegations included the denial of vacation requests); *Katz v. Beth Israel Med. Ctr.,* No. 95 Civ. 7183(AGS), 2001 WL 11064, at *12 (S.D.N.Y. Jan.4, 2001) (finding plaintiff was not constructively discharged even though she allegedly was unable to take breaks during the workday, and, on one occasion was not allowed to leave work for several hours to seek medical care); *Barbagallo v. Gen. Motors Corp.,* No. 88 Civ. 1534(MJL), 1996 WL 19004, at *5 (S.D.N.Y. Jan.17, 1996) (finding no constructive discharge despite plaintiff's claim that his health was adversely affected by his substantially increased workload).

▮▮▮ Here, even if Wright were able to substantiate all of his assertions concerning his situation in the T & E unit, it is clear that a reasonable person would not have found the workplace environment so overwhelmingly inhospitable that resignation was the *only* viable option. Instead Wright has, at best, shown that he was

unhappy at work, and that his supervisors were equally displeased with him. Although Wright apparently believed that he was about to be discharged, the Defendants plainly had not told him that the situation was irretrievable. Indeed, Newman expressly gave Wright two weeks to demonstrate that he was meeting Goldman's performance standards, a decision which hardly bespeaks an environment so unrelentingly difficult that Wright could not remain. *See Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1188–89 (2d Cir.1987) (concluding that there was an issue of fact as to whether the plaintiff was constructively discharged where his supervisor "told him he would be fired at the end of [a] 90–day probationary period no matter what he did to improve his allegedly deficient performance.").

While a court faced with a summary judgment motion should not resolve disputed issues. of fact, it is apparent that many people faced with the set of circumstances that Wright encountered would have redoubled their efforts to cure the defects that their employer perceived, rather than simply tendering their resignation. For that reason alone, the Defendants are entitled to summary judgment on Wright's constructive discharge claim.[7]

### 3. *Disparate Treatment*

▮▮▮ Wright's final claim under Title VII is that he was the victim of disparate treatment. A plaintiff bringing such a claim may establish a prima facie case in one of two ways: "either ( [a] ) by showing that he has suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of race, color, religion, sex, or national origin, or ( [b] ) by demonstrating that harass-

---

**7.** I therefore have not considered whether the Defendants acted deliberately or the circum-

stances surrounding Wright's resignation gave rise to an inference of discrimination.

ment on one or more of these bases amounted to a hostile work environment." *Feingold v. State of New York*, 366 F.3d 138, 149 (2d Cir.2004). Isolated instances of harassment, however, unless "extremely serious," are not sufficient to establish a hostile work environment. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001).

Although the amended complaint uses the word "harassment" twice, (*see* Am. Compl. ¶ 20 & Prayer for Relief ¶ (a)), in his papers opposing the Defendants' motion for summary judgment, Wright fails to take issue with the Defendants' observation that he "did not interpose any factual allegations to establish, or even suggest, a claim of hostile environment." (*See* Defs.' Mem at 25). Instead, Wright restricts his argument to the assertion that he suffered an adverse employment action under circumstances suggesting that it was based on discrimination. (Pl.'s Mem. at 7–8).

 As was true of Wright's constructive discharge claim, to establish a disparate treatment claim, Wright must first show that he suffered an "adverse employment action," which necessitates something " 'more disruptive than a mere inconvenience or an alteration of job responsibilities.' " *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000) (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993). To rise to the level of a Title VII violation, the action must constitute a " 'materially adverse change' in the terms and conditions of employment." *Pimentel v. City of New York*, No. 00 Civ. 326(SAS), 2002 WL 977535, at *3 (S.D.N.Y. May 14, 2002) (quoting *Galabya*, 202 F.3d at 640). An adverse employment action thus may include a "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminish-

ed material responsibilities, or other indices … unique to a particular situation." *Galabya*, 202 F.3d at 640 (ellipsis in original). By the same token, however, "not everything that makes an employee unhappy is an actionable adverse action." *Pimentel*, 2002 WL 977535, at *3 (quoting *Phillips v. Bowen*, 278 F.3d 103, 117 (2d Cir.2002)).

Several of the allegations of disparate treatment that Wright advances in this case are unsupported by the evidence before the Court. For example, Wright alleges that he was given a disproportionate share of the T & E unit processing work, but conceded at his deposition that he did not know how much work was assigned to his coworkers. Wright similarly complains that Bernardo removed completed reports from his desk, but has failed to adduce any evidence that his coworkers did not encounter the same problem. Such unsupported and conclusory allegations obviously are insufficient to meet Wright's burden of establishing a *prima facie* disparate treatment claim.

 The remaining allegations upon which Wright relies, even when viewed as a totality, plainly constitute the sort of inconsequential harms that, as a matter of law, cannot give rise to a Title VII disparate treatment claim. *See. e.g., Adams*, 2004 WL 1737826, at *5 (denial of plaintiff's request to be transferred to another supervisor "does not constitute an adverse employment action for purposes of establishing a prima facie case of disparate treatment."); *Gordon v. New York City Bd. of Educ.*, No. 01 Civ. 9265(SAS), 2003 WL 169800, at *6 (Jan. 23, 2003) ("It is well-settled that negative evaluations alone, without any accompanying adverse consequences, such as a demotion, diminution of wages, or other tangible loss, do not constitute adverse employment actions."); *Figueroa v. City of New York*, 198

F.Supp.2d 555, 568 (S.D.N.Y.2002) ("being precluded from working on a particular day [does not] constitute [a] materially adverse employment action[ ]"); *Fridia v. Henderson,* No. 99 Civ. 10749(BSJ), 2000 WL 1772779, at *7 (S.D.N.Y. Nov.30, 2000) (plaintiff's allegations of excessive work, denials of leave with pay, and mistreatment by her supervisor do not constitute adverse employment actions).

To be sure, *if* Goldman had terminated Wright at the end of his probationary period, he would have suffered a materially adverse change in the terms and conditions of his employment. As a consequence, the Court would be required to consider whether there was any evidence that his dismissal was racially motivated. In that connection, any evidence that the Defendants had treated Wright differently than his Asian coworkers plainly would be relevant. However, the unassailable truth is that Wright was not subjected to an adverse employment action before he resigned from Goldman's employ. Moreover, as noted above, his resignation did not occur under circumstances which amounted to a constructive discharge. Accordingly, because Wright is unable to establish that he was the victim of an adverse employment action, he cannot make the *prima facie* showing necessary to pursue a claim that the Defendants violated Title VII by treating him differently than they treated non-African-American employees.

The Defendants are therefore entitled to summary judgment on Wright's disparate treatment claim.

## C. *Section 1981*

In his Amended Complaint, Wright also contends that the Defendants conduct also violated 42 U.S.C. § 1981, which provides, in part, that "[a]ll persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Section 1981 "thus outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." *Patterson v. County of Oneida,* 375 F.3d 206, 224 (2d Cir.2004). Wright alleges that the Defendants violated Section 1981 because their racial discrimination interfered with "his ability to perform his contract with Goldman." (Pl.'s Mem. at 9).

■ Although a Section 1981 claim requires a showing that a contractual relationship existed, employment discrimination claims under that statute are judged by the same standards as a Title VII claim. *See, e.g., Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d Cir.2004) ("the factors justifying summary judgment dismissing [plaintiff's] Title VII claims against the municipal defendants for termination of his employment equally support the summary dismissal of his claims for termination brought under 42 U.S.C. §§ 1981 and 1983"); *Hargett v. Nat'l Westminster Bank, USA,* 78 F.3d 836, 838–39 (2d Cir.1996) (applying Title VII analysis to Section 1981 claim); *Franklin v. City of New York,* No. 01 Civ. 10574(DLC), 2003 WL 21511932, at *5 (S.D.N.Y. July 1, 2003) (citing *Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989)); *Commodari v. Long Island Univ.,* 89 F.Supp.2d 353, 385 (E.D.N.Y.2000) ("The requirements of [a] prima facie case of discrimination are the same under Title VII as under § 1981.") Consequently, because the Defendants are entitled to summary judgment with respect to all three of Wright's claims under Title VII, his Section 1981 claim also must be dismissed.

### D. *Section 1983*

Finally, in his amended complaint, Wright seeks to assert a claim under 42 U.S.C. § 1983. Section 1983 provides that:

> Every person who, *under color of any statute,* ordinance, regulation, custom, or usage, *of any State* ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983 (emphasis added).

 As the statute expressly states, to be liable under Section 1983, a person must be acting under the color of law. "Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of [Section] 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999) (internal quotation marks deleted). *See also R–Goshen LLC v. Village of Goshen,* 289 F.Supp.2d 441, 445 (S.D.N.Y.2003) (granting summary judgment on plaintiff's Section 1983 claim because defendant was not a state actor).

 Here, there plainly has been no showing that any of the Defendants acted under color of state law. The Defendants therefore are also entitled to summary judgment with respect to Wright's Section 1983 claim.

### IV. *Conclusion*

For the foregoing reasons, the Defendants' motion for summary judgment should be granted and this case should be dismissed.

### V. *Notice of Procedure For Filing of Objections to this Report and Recommendation*

The parties are hereby directed that if they have any objections to this Report and Recommendation, they must, within ten (10) days from today, make them in writing, file them with the Clerk of the Court, and send copies to the chambers of the Honorable George B. Daniels, United States District Judge, at the United States Courthouse, 40 Centre Street, New York, N.Y. 10007, to the chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, N.Y. 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Daniels. Any failure to file timely objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72(b).

Oct. 21, 2004.